**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **CRIMINAL NO. PX-23-441** |
| **DEJUAN LEONARD,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS TO SUPPRESS**

**EVIDENCE AND STATEMENTS**

The United States of America, by and through undersigned counsel, respectfully submits the following response in opposition to the motions to suppress submitted by Dejuan Leonard ("the Defendant"). ECF Nos. 22 and 23.

The Defendant seeks to suppress evidence recovered by law enforcement on September 12, 2023, during a traffic stop, claiming that law enforcement had no basis for the traffic stop, justification to frisk him, or reason to impound his vehicle. ECF No. 23. The facts and the law establish that law enforcement had reasonable suspicion to stop the Defendant, that the Defendant consented to be frisked, and that law enforcement properly impounded his vehicle. The Defendant's motion to suppress evidence should therefore be denied.

The Defendant also seeks to suppress the statements he made to law enforcement during the same traffic stop. ECF No. 22. The facts and the law establish that law enforcement was not required to *Mirandize* the Defendant, that law enforcement's questions were well within the duration and scope of the traffic stop, and that the Defendant's statements to law enforcement were either voluntary or made after he was properly advised of his *Miranda* rights. The Defendant's motion to suppress his statements to law enforcement should therefore be denied.

## BACKGROUND

### I.    Factual Background

The Government anticipates that the following facts will be established during an evidentiary hearing in this matter.

> #### a.    PGPD Officers patrolled high-crime area aware of common scheme to avoid paying insurance by registering vehicles in Virginia.

On September 12, 2023, members of the Prince George's County Police Department ("PGPD") patrolled the area surrounding Silver Hill Road and Royal Plaza Drive in Suitland, Maryland—a high crime area in the District of Maryland near the Washington, DC border.  The squad included Cpl. Wigmore, Cpl. Clark, and Officers Groce, and Guevara, who were driving several police vehicles.  Before that day, members of the squad had learned through their training, knowledge, and experience, that motorists in Central and Southern Maryland frequently attempt to circumvent laws requiring insurance of vehicles by registering their vehicles in the Commonwealth of Virginia.[1]

---

[1] This is a well-documented and common scheme in the region. *See*, *Why are so many Virginia License Plates on Baltimore's* Streets, Baltimore Banner (Feb. 12, 2024), https://www.thebaltimorebanner.com/community/transportation/baltimore-maryland-virginia-mva-dmv-mccray-GDWBNWUDLJDRVAVDJBRM6M4AHU/ ("It has been an open secret for decades that Maryland residents have been getting their vehicles registered in Virginia to save money. *The Washington Post* reported in 1987 that as many as 40,000 Marylanders were registering their cars in Virginia to avoid higher taxes and insurance, costing the state up to $10 million in lost revenue.);  Khiree Stewart, *Bill would give Baltimore City Power to Tow, Impound Cars Improperly Out of State*, WBALTV (Feb. 18, 2024),  https://www.wbaltv.com/article/out-of-state-virginia-license-plate-registration-house-bill-332/46826156 ("There are approximately 34,000 vehicles in the state of Maryland improperly registered with a Virginia tag.  This violation allows Maryland ([and] Baltimore City) to lose much needed revenue while (Marylanders) [and] Baltimore City residents' bear the burden with increases in their insurance premiums."); Jessica Albert, *City, state lawmakers push to get illegally-registered cars off Baltimore streets,* CBS News Baltimore (February 26, 2024), https://www.cbsnews.com/baltimore/news/maryland-lawmakers-discuss-legislation-on-out-of-state-license-plate-tags/ (Citing testimony from Baltimore City Councilman "There's a lot of illegal tags out there on the street.  So what happens when somebody doesn't have insurance?  Somebody got to pay for it and our taxpayers are paying for it and that's why our insurance is going up in Baltimore."); *Maryland Drivers Cutting Costs in Virginia*, Washington Post (May 19, 1987),  https://www.washingtonpost.com/archive/local/1987/05/19/md-drivers-cutting-costs-in-va/14843324-1578-43e8-8f77-51048eb21b06/ ("Some Maryland motorists are crossing state lines and registering their cars in Virginia where they can take advantage of low taxes and lower insurance rates").

**b.  While patrolling a high crime area, law enforcement observed a
vehicle with very dark front windshield and side window tint.**

At approximately 12:30 p.m., Cpl. Wigmore observed a 2007 navy-blue Hyundai Azera

bearing Virginia tags TMT-4207 with extremely dark tinted front windshield and side windows

circulating on Silver Hill Road.  Cpl. Wigmore used her radio to advise the other officers that she

intended to stop the Hyundai.  Cpl. Wigmore then accelerated to catch up to the Hyundai and, once

her police car was behind it, activated her police car's lights and siren.  As she pulled over behind

the Hyundai, Cpl. Wigmore read the vehicle's tags into her radio.[2] **Exhibit 1 at 12:35:25.**[3] Officer

Groce parked his police car in front of the Hyundai and Cpl. Clark and Officer Guevara parked

behind Cpl. Wigmore's police car.  As Officer Groce parked his police car in front of the Hyundai,

he confirmed Cpl. Wigmore's observations by stating on the radio, "front windshield tint as well;

can't see inside."  **Exhibit 1 at 12:35:36**.  The stop is captured on body-worn and cruiser cameras

of Cpl. Wigmore, Cpl. Clark, and Officers Groce, and Guevara.

---

[2] Due to a typographical error, most of the paperwork in this case (including the statement of probable cause) lists
the vehicle tags as TWT4207 instead of TMT4207. However, the correct tags – TMT2407 – are clearly visible in
body-worn camera footage and photographs of the vehicle.
[3] All times are approximate and based on timestamps reflected in the exhibits.



*Law enforcement stopped this Hyundai with heavily-tinted front windshield and windows.*

### c. Officer approached the vehicle and Defendant admitted to having illegal tint on his front windshield and side windows.

Cpl. Wigmore then began cautiously approaching the Hyundai but maintaining her distance for safety reasons. As she approached, the following exchange between Cpl. Wigmore and the driver, later identified as the Defendant, took place:

Cpl. Wigmore: "Hey there, do you mind rolling your windows down please?
*Defendant rolls down driver-side front window.*
Cpl. Wigmore:  "Can you run your back windows down?  I can't see anything inside of your car."
*Defendant rolls down driver-side back window.*
Cpl. Wigmore: "I appreciate it, hun.  How are you?"
Defendant: "Doing great."
Cpl. Wigmore: "Look, I'm Officer Wigmore with the Prince George's County Police Department, okay?  You are being audibly and visually recorded.  The reason I'm stopping you today is—I know you have Virginia tags—but your tint is *so* dark, sir."
Defendant: "They are 20%, though."
Officer Wigmore: "But you can't have no front windshield tint.  This is like, this is illegal in Maryland.  This is deemed an unsafe motor vehicle.  You can't .  There is no way at night that you can drive safely and see out of this."

**Exhibit 1, 12:35:42 to 12:36:20.**

Cpl. Wigmore then asked the Defendant for his driver's license and the vehicle's registration.  The Defendant provided a DC license and a Virginia registration to Cpl. Wigmore. The Defendant's license showed that at the time of the stop, the Defendant was 29 years old and was approximately 6 feet 2 inches tall.  The Defendant appeared alert, aware of his surroundings, and spoke and understood the English language.

### d.  The Defendant consented to a pat-down frisk.

Cpl. Wigmore then asked the Defendant to step out of the vehicle so she could use the tint meter on the vehicle's windows and show him the results.  The Defendant complied and got out of the vehicle.  **Exhibit 1 at 12:37:04.**  Once the Defendant was out of the vehicle, Cpl. Wigmore asked if she could pat him down for safety reasons.  The Defendant consented to the pat down. Specifically, the following exchange took place:

5

> Cpl. Wigmore: "Nothing that can poke us, stick us hurt us?"
> Defendant: "No, ma'am."
> Cpl. Wigmore: "Do you mind if I check to make sure that you don't got a knife or a syringe or an axe on you?  You okay with that?"
> Defendant: "yeah"
> Cpl. Wigmore: "Thanks, hun."

**Exhibit 1, 12:37:00 to 12:37:17.**

Cpl Wigmore then proceeded to pat down the Defendant.  She did not find any weapons or sharp objects.

### e.  Officer Wigmore advised the Defendant that she may tow the Hyundai.

Cpl. Wigmore then asked the Defendant to take a seat on the hood of her police vehicle which was parked behind the Hyundai.  As the Defendant walked in the direction of Cpl. Wigmore's vehicle, the Defendant stated: "I didn't know that 20% was illegal." **Exhibit 1, 12:37:40.**  Cpl. Wigmore added: "And you can't have any front windshield tint.  That's why I had you roll down the windows.  We can tow the car for front windshield tint, alright?"[4] **Exhibit 1, 12:37:50**.  Officer Wigmore then returned to her vehicle to run the Defendant's driver's license and registration.

### f.  Defendant voluntarily disclosed not having insurance to Officer Guevara.

While Cpl. Wigmore was running the Defendant's driver's license and registration, the following exchange took place between Officer Guevara and the Defendant, who were standing in front of Cpl. Wigmore's police car.

> Officer Guevara:  "You are not from Virginia are you?"
> Defendant:  "No, I'm from DC."
> Officer Guevara:  "He's got Virginia tags."
> Defendant:  "It's an older car, so I didn't feel like paying for insurance.  It's an '07, you know what I'm saying?  So I didn't want to pay for insurance."

---

[4] The Government anticipates that Cpl. Wigmore will testify that she and members of her squad use the words "tow" and "impound" interchangeably.

Officer Guevara: "So, you are telling me your car is not insured either?"
Defendant: "There's no insurance on it.  That's why I went to Virginia and got the tag.  I just got the car the other day."

**Exhibit 2, 12:37:38 to 12:38:26.**

Knowing that the Hyundai would likely be impounded, Officer Guevara then asked for the Defendant's consent to search the car "to speed up the process," which the Defendant refused. Officer Guevara then advised the Defendant that the vehicle would be towed and searched in any case.  Specifically, Officer Guevara stated: "Alright.  We can go the route of towing it then.  And then we'll search the car.  And then you'll probably be walking.  Do you have someone to pick you up?  No dead bodies?  Because we are going to search the car anyway."  **Exhibit 2, 12:37:38 to 12:38:55.**

While the above conversation between Officer Guevara and the Defendant was taking place, and Cpl. Wigmore was running the Defendant's driver's license in her police car, Cpl. Clark approached the open front passenger window of Cpl. Wigmore's car.  Cpl. Wigmore said to Cpl. Clark: "I'm running his driver's license, but I may tow it for the tint."  **Exhibit 1, 12:38:38.**  Cpl. Clark then advised Wigmore that the Defendant became "really shaky" after being asked for consent to search his car.  **Exhibit 1, 12:38:43.** Cpl. Wigmore responded: "It's okay, my thing is this, I'm going to run his driver's license, I'm going to make sure his driver's license is good, but I'm probably going to end up towing his vehicle for the front windshield tint."  **Exhibit 1, 12:38:48.**

### g.  Cpl. Wigmore learned from Defendant that his vehicle was not insured and advised Defendant that she would impound his vehicle.

At approximately 12:39 p.m., Cpl. Wigmore then exited her vehicle and walked in the direction of the Hyundai, as Officer Guevara said to the Defendant: "You've got no insurance so

this vehicle can't be on the road.  So we can tow the car, that's why.  I was asking for consent at first, but if you don't want to consent, that's fine."  **Exhibit 2, 12:39:00.**

A few seconds later, Cpl. Wigmore addressed the Defendant again.

Cpl. Wigmore:  "So, do you have insurance on this car?"
Defendant: "No, I just got the car the other day."
Cpl. Wigmore: "You can't drive a car without insurance.  And you can't have the front windshield tint, okay?  I can't let you.  You end up becoming a hazard to everyone on the road.  You got, are you able to have someone pick you up from here? . . . So, I'm going to tow your car today. . . . You've got to get your insurance taken care of for me, okay?"

**Exhibit 1, 12:39:10 to 12:39:45.**

### h. Cpl. Wigmore began the impound inventory and found a loaded firearm.

Following the exchange above, Cpl. Clark requested a flatbed truck and Cpl. Wigmore approached the Hyundai to begin the impound inventory.  As part of the inventory, Cpl. Wigmore then opened the front passenger-side door of the vehicle and the compartments in the vehicle's center console identify valuables and to secure the scene.  After seeing a firearm in the center console, Cpl. Wigmore exited the vehicle, and exclaimed "George!" to alert her squad of the presence of a firearm. **Exhibit 1, 12:40:09.**

Cpl. Clark and Officer Groce immediately handcuffed the Defendant, and Cpl. Clark advised him that he was being temporarily detained.  **Exhibit 3, 12:40:18.**  The Defendant asked why he was in handcuffs and stated that he had not given consent to search his vehicle.  Cpl. Wigmore explained:

"You have to have that insurance.  Driving without insurance is also a jailable offense.  Right now you are in handcuffs and – you are being detained.  . . . I'm impounding the vehicle. . . . When I tow a vehicle, I have to conduct an impound inventory.  This [pointing at Cpl. Clark] is my supervisor . . . I told him in there, right when I sat down – 'I'm going to tow your car for the front windshield tint.'  When I came outside, you said you didn't have insurance.  You know, like, my hands are strapped at that point, okay?  I have to

8

conduct impound inventory of the vehicle, which is a thorough search of the car to inventory everything in the vehicle, okay?"

**Exhibit 1, 12:40:47 to 12:41:45.**

### i. Officers retrieved loaded firearm, suspected drugs, drug paraphernalia, and a tinting receipt from Defendant's vehicle.

Officers then began taking pictures inside and outside of the vehicle. Cpl. Wigmore and Officer Groce also performed three readings on the front driver-side window using a tint meter. The three readings were: 15, 17, 17. **Exhibit 1, 12:42:54 to 12:43:10.**

Officers then retrieved the firearm previously seen by Cpl. Wigmore, a black .40 caliber Glock 27 handgun, from the center console. The gun was loaded with 13 unfired .40 caliber rounds of ammunition. **Exhibit 1, 12:44:30.**

Officers also retrieved from the center console a digital scale, and a window tinting receipt. **Exhibit 1, 12:45:05 to 12:46:00.** The receipt, dated September 1, 2023, bore the Defendant's name and confirmed that the windows and front windshield had been modified to a 20% tint. The receipt stated that a 20% tint is "illegal in DC, MD, and VA (not recommended)." The Defendant's initials were also found next to that statement. A picture of the receipt is included below.

*Law enforcement found a tinting receipt bearing Defendant's name.*

In addition to the receipt, the firearm, and the ammunition, law enforcement retrieved a bag containing 334 grams of suspected cannabis from the rear passenger floorboard. A picture of the firearm, ammunition, and bag is included below.



*Loaded firearm and bag containing suspected cannabis recovered from Defendant's vehicle.*

### j.  Cpl Clark advised the Defendant of his *Miranda* rights.

While Cpl. Wigmore and Officer Guevara conducted the impound inventory, Officer Groce remained with the Defendant. Cpl. Clark then approached the Defendant, took a picture of him, and read him his *Miranda* rights.

> "Mr. Leonard, I'm going to read you your rights, okay?  Alright?  Mr. Leonard, you do have the right to remain silent. Anything you say or write may be used against you in a court of law. You have the right to talk to a lawyer before answering any questions and to have a lawyer present at any time before or during questioning.  If you now want the assistance of a lawyer but cannot afford to hire one, you will not be asked any more questions at this time, and you may request the court to appoint a lawyer for you without charge.  If you agree to answer questions, you may stop at any time and request the assistance of a lawyer, and no further questions will be asked of you.  Do you understand your rights, Mr. Leonard, yes or no?"

**Exhibit 3, 12:46:00 to 12:47:40.**  The Defendant acknowledged that he understood his rights but did not make any additional statements at that time.  The Defendant was then transported to Westphalia Division VIII station and subsequently to the Department of Corrections in Upper Marlboro for processing.

**k.  Law enforcement issued four citations to the Defendant.**

The Defendant was issued the following citations in connection with this stop:

1.  Installing Window Tinting Material Not in Compliance with Requirements, in violation of TA – 22-406(i)(3);

2.  Operating a Vehicle on a Highway with Unauthorized Window Tinting Material in violation of TA – 22-406(i)(1);

3.  Knowingly Driving an Uninsured Vehicle, in violation of TA – 17-107(a)(1);

4.  Driving an Unsafe Vehicle on a Highway, in violation of TA – 22-101(a).


**II.      Procedural Background**

On December 7, 2023, a federal grand jury for the District of Maryland returned an indictment charging the Defendant with one count of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1.  On February 14, 2024, the Defendant had an initial appearance, arraignment, and detention hearing.  ECF No. 4.  The Defendant pled not guilty at his arraignment.  *Id.*  The Defendant consented to detention pending trial.  ECF No. 10.  On May 13, 2024, the Defendant filed the pending motions to suppress evidence and statements.  ECF Nos. 22 and 23.


**ARGUMENT**

**I.      Cpl. Wigmore Had Reasonable Suspicion to Stop the Defendant.**

"'The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and

citizens, which require no objective justification.'" *United States v. Spearman*, 254 F. App'x 178, 181 (4th Cir. 2007) (quoting *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)).  To be lawful under the Fourth Amendment, a brief, investigatory stop of an individual must be supported by reasonable, articulable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  The reasonable suspicion standard "is a less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  To determine whether an officer had reasonable suspicion to conduct an investigatory traffic stop, courts apply an objective test rather than examining the subjective beliefs of the investigating officer.  *Id.*

"When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).  Therefore, "[a]n automobile stop is [] subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Wren v. United States*, 517 U.S. 806, 810 (1996).  In determining whether a traffic stop is reasonable, the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), is applied, and a court asks (1) if the stop was "legitimate at its inception," *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017), and (2) if "the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop," *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015).

In determining whether reasonable suspicion exists, courts must examine the "'totality of the circumstances – the whole picture.'" *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).  As the Fourth Circuit explained:

> A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). A suspect's suspicious movements can also be taken to suggest that the suspect may have a

weapon. *See, e.g.*, *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998). And multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient. *See United States v. Branch*, 537 F.3d 328, 339 (4th Cir.2008). Thus, we will not find reasonable suspicion lacking "based merely on a 'piecemeal refutation of each individual' fact and inference." *Id.* at 337 (quoting *United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir.1988)).

*United States v. George*, 732 F.3d 296, 299–300 (4th Cir. 2013). Moreover, "[j]udicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008) cert. denied, 555 U.S. 1118 (2009).

As explained below, a Fourth Amendment stop occurred when Cpl. Wigmore turned on her police car's siren and the Defendant pulled over by the side of the road. By that point, the officers had reasonable suspicion to stop the Defendant based on their first-hand observations of excessive window tints on the vehicle, which were in violation of the Maryland Transportation code.

       **a. The officers initiated a brief investigatory stop when the Defendant pulled over after hearing the police siren and obeyed Cpl. Wigmore's commands.**

In assessing the reasonableness of the stop in this case, the first question the Court must address is when a Fourth Amendment stop occurred. "'[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). A seizure "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *See id.* at 626 (emphasis in original); *Terry v. Ohio*, 392 U.S. at 19 n.16; *United States v. Brown*, 401 U.S. 588, 594 (4th Cir. 2005).

Here, the officers displayed a show of authority when Cpl. Wigmore activated her police car's lights and siren, and the Defendant pulled over by the side of the road and followed Cpl. Wigmore's instructions to lower his windows.  *See United States v. Stover*, 808 F.3d 991, 1000 (4th Cir. 2015) (an individual may signal submission to police authority by complying with police orders); *United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005) (defendant submitted to show of authority when he followed officers' commands); *see also*, *United States v. Brooks*, No. CR ELH-20-034, 2024 WL 1140692, at *8 (D. Md. Mar. 14, 2024) (finding that the activation emergency equipment after positioning a police car behind defendant's vehicle was a show of authority).

> **b.  The officers had reasonable suspicion to stop the Defendant based on their location in a high crime area; training, knowledge, and experience; and observation of excessive window tints on the Defendant's Vehicle.**

While patrolling a high-crime area, the officers observed the excessively tinted windows of the Defendant's vehicle and therefore had a reasonable basis to stop and investigate violations of Maryland's unsafe vehicle statute and Maryland's vehicle tint statute.  *See United States v. Green*, 740 F.3d 275 (4th Cir. 2014) (affirming district court's denial of suppression motion where officer conducted traffic stop based on observing vehicle's illegal window tint); *United States v. Taylor*, 60 F. App'x 212, 214 (4th Cir. 2015) (traffic stop proper where officers had reason to believe vehicle's window tint was excessive); *United States v. Richardson,* 801 F. App'x 157 (4th Cir. 2020) (affirming district court's denial of suppression motion where officer conducted traffic stop based on vehicle driving erratically and having window tint excessively dark).

> **i.  The officers had reasonable suspicion to stop the vehicle based on Maryland Unsafe Vehicle Statute**

The officers had reasonable suspicion to stop the vehicle based on Md. Transportation Code § 22-101(a)(1)—a statute under which the Defendant was cited—which prohibits any person

from driving a vehicle in an "unsafe condition as to endanger any person," and under which law enforcement issued a citation in this case.

In *Devonta Johnson*, *Baez,* and *Brooks*, the Government argued that § 22-101(a)(1) provided an alternative basis for finding the stop lawful given that excessive window tints make a vehicle unsafe. *See United States v. Devonta Tawain Johnson*, 2021 WL 5882570, at *1; ; *Baez v. State*, 192 F.3d 945, 951 (Md. Ct. Spec. App. 2018); *United States v. Brooks*, 679 F. Supp. 3d 225, 229 (D. Md. 2023). In *Brooks*, which involved a vehicle with tinted front windshield in a parking lot, Judge Chuang declined to uphold a stop on the basis of this statute after finding that the defendant was not operating on a highway, as required by the statute. *Brooks*, 679 F. Supp. 3d 238. Conversely, the *Devonta Johnson* and *Baez* courts did not reach the issue because the stop was upheld under Maryland's window tint statute. *See Devonta Johnson*, 2021 WL 5882570, at *1; *Baez v. State*, 192 A.3d at 951. However, the Court of Special Appeals in *Baez* did give a thorough explanation of the public safety reasons for prohibiting excessive window tint. The Court of Special Appeals explained that "the primary, underlying purpose of the [Maryland window tint] statute was that because excessively tinted windows prevent officers from perceiving dangers or problems inside the vehicle, the legislation was necessary to protect the safety of law enforcement officers who stop and approach a vehicle." *Id.* at 949. The Court of Special Appeals also quoted the Fourth Circuit's opinion in *United States v. Stanfield*, 109 F.3d 976, 981–82 (4th Cir. 1997), which stated:

> When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. *Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than*

> *approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.*

*Id.* (emphasis in original). Finally, the Court of Special Appeals looked to a decision of the District of Columbia Court of Appeals, which reasoned that "excessively tinted windows constitute a safety violation to the general public because '[a]ccording to the Metropolitan Police Department, deeply tinted windows impair a driver's vision and contribute to accidents of all kinds.'" *Id.* at 950 (quoting *Tucker v. United States*, 708 A.2d 645, 648 (D.C. 1998)).

Given these safety risks, especially in a high crime area, law enforcement had reasonable suspicion to stop the Defendant under § 22-101(a)(1) because his excessive window tints constituted an "unsafe condition as to endanger any person." *Cf. Muse v. State*, 807 A.2d 113, 119 (Md. Ct. Spec. App. 2002) (holding cracked windshield sufficient to provide reasonable suspicion to justify stop under § 22-101(a)(1)); *Smith v. State*, 75 A.3d 1048, 1054 (Md. Ct. Spec. App. 2013) (same for malfunctioning brake light); *Ray v. State*, 47 A.3d 1113, 1123 (Md. Ct. Spec. App. 2012) (Officer "had reasonable articulable suspicion to believe [the vehicle] was being driven contrary to the laws governing the operation of motor vehicles. . . A violation of the transportation article's statutes, even those that concern a vehicle's equipment rather than moving violations, provides reasonable articulable suspicion to initiate a traffic stop") *aff'd*, 435 Md. 1, 76 A.3d 1143 (2013)

This is especially true here, because the Defendant's driver side window was so dark it was nearly opaque – only letting 15-17% of visible light transmission—while the front windshield was also tinted below the AS1 line, which is illegal in all 50 states and the District of Columbia and in violation of Federal Motor Vehicle Standards.

Therefore, law enforcement officers had reasonable suspicion to stop the Defendant because of his excessive window tints under either § 22-406 or § 22-101(a)(1).

ii.  **The language and structure of Maryland's window tint statute establish that the officers could stop the Defendant based on his vehicle's excessive tint.**

The Court should also find that the officers had reasonable suspicion to stop the Defendant for violations of the Maryland window tint statute.  Title 22, section 406(i) of the Maryland Code governs vehicular window tinting in the State of Maryland.  That section has four paragraphs and reads:

(1)    Except as provided in paragraph (4) of this subsection, a person may not operate a vehicle registered under § 13-912, § 13-913, § 13-917, or § 13-937 of this article on a highway in this State if:

   (i)    In the case of a vehicle registered under § 13-912 of this article, there is affixed to any window of the vehicle any tinting materials added to the window after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%; and

   (ii)    In the case of a vehicle registered under § 13-913, § 13-917 or § 13-937 of this article, there is affixed to any window to the immediate right or left of the driver any window tinting materials added after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%.

(2)    If a police officer observes that a vehicle is being operated in violation of paragraph (1) of this subsection, the officer may stop the driver of the vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order in accordance with the provisions of § 23-105 of this article.

(3)    A person may not install on a window of a vehicle any window tinting material that does not comply with the light transmittance requirements specified in paragraph (1) of this subsection.

(4)

   (i)    A person who must be protected from the sun for medical reasons is exempt from the provisions of paragraph (1) of this subsection if the owner has, in the vehicle at the time the vehicle is stopped by a police officer, a written certification in the manner and format required by the Automotive Safety Enforcement Division of the Department of State Police that details the owner's medical need for tinted windows with a light transmittance of less than the allowed 35%, from a physician licensed to practice medicine in the State.

18

(ii)     A written certification under this paragraph shall be valid for a period of time that the licensed physician determines the owner needs the enhanced tinted windows, not to exceed 2 years.

(iii)     This subsection does not apply to tinting materials that: 1. Are affixed in such a manner so as to be easily removed; and 2. Are being used to protect a child less than 10 years of age from the sun.

(iv)     Nothing in this subsection may be construed to: 1. Allow any tinting materials to be added to the windshield of a vehicle below the AS1 line or below 5 inches from the top of the windshield; 2. Prohibit a person from operating the vehicle while the person for whom the written certification is required is not present in the vehicle, provided that the written certification is in the vehicle; or 3. Alter or restrict the authority of the administrator to adopt regulations regarding vehicle windows, except with respect to the light transmittance requirements specified in this section.

Paragraph 1 prohibits individuals from operating certain vehicles, which are required to be registered in Maryland, with window tinting materials that allow for less than 35% visible light transmission.  *See* Md. Code, Transp. § 22-406(i)(1).

Paragraph 2 instructs law enforcement officers who observe a vehicle in operating violation of section 22-406(i)(1) that those officers may, at their discretion, conduct a traffic stop and issue a citation and an equipment repair order.  *See* Md. Code, Transp. § 22-406(i)(2).

Paragraph 3 prohibits the installation of tinting materials on any vehicle windows below the light transmittance requirements of Paragraph 1 (*i.e.* 35%).  Notably, unlike Paragraph 1, the language of Paragraph 3 has no requirement that the vehicle with tinted windows be operating within a highway of the State or that the vehicle be required to be registered in Maryland.  *See* Md. Code, Transp. § 22-406(i)(3).

Lastly, Paragraph 4 specifies, in relevant part, that nothing in subsection 406(i) allows tint of a windshield below the AS1 line (a line near the top of the windshield that manufacturers are required to include under federal motor vehicle standards to mark the boundary for tint

19

application) or below 5 inches from the top of the windshield, unless a medical exception applies *See* Md. Code, Transp. § 22-406(i)(4)(iv) ("Nothing in this subsection may be construed to: 1. Allow any tinting materials to be added to the windshield of a vehicle below the AS1 line or below 5 inches from the top of the windshield."). In fact, additional window tint below the AS1 line is illegal in all 50 states and the District of Columbia.[5] And like Paragraph 3, the language

---

[5] *See* **Alabama**, Ala. Code § 32-5C-2(a)(1); **Alaska**, 13 AAC 04.223(b)(1); **Arizona**, Ariz. Rev. Stat. Ann. § 28-959.01(A)(11), (B), (C); **Arkansas**, Ark. Code Ann. § 27-37-306(b)(1); **California**, Cal. Veh. Code § 26708(a), (c); **Colorado**, Colo. Rev. Stat. Ann. § 42-4-227(1)(a)(I), (1)(b); 7. **Connecticut**, Conn. Gen. Stat. Ann. § 14-99g(b), (c)(11); **Delaware**, Del. Code Ann. tit. 21, § 4313(b); **Florida**, Fla. Stat. Ann. § 316.2952(2); **Georgia**, Ga. Code Ann. § 40-8-73.1(b); **Hawaii**, Haw. Rev. Stat. Ann. § 291-21.5 (a), (b), (c)(6), (c)(11); **Idaho**, Idaho Code Ann. § 49-944(1)(a), (2); **Illinois**, 625 Ill. Comp. Stat. Ann. 5/12-501(a), 12-503(a); **Indiana**, Ind. Code Ann. § 9-19-19-4(a), (c), (d); **Iowa** Code Ann. § 321.438(1), (2), Iowa DOT window tint standards, available at https://www.iowadot.gov/mvd/resources/windowtintingstandards.pdf; **Kansas**, Kan. Stat. Ann. § 8-1749a(a)(1); **Kentucky**, Ky. Rev. Stat. Ann. § 189.110(1), (2)(b); **Louisiana**, La. Stat. Ann. § 32:361.1(B), (C)(2); **Maine**, Me. Rev. Stat. tit. 29-A, § 1916(1)(B), (2)(A)(3); **Maryland**, Md. Code, Transp. § 22-406(i)(4)(iv); **Massachusetts**, Mass Gen. Laws Ann. ch. 90, § 9D(2), (4), (5); **Michigan**, Mich. Comp. Laws Ann. § 257.709(1)(A); **Minnesota**, Minn. Stat. Ann. § 169.71(Subd. 4)(1); **Mississippi**, Miss. Code. Ann. § 63-7-59(1); **Missouri**, Mo. Ann. Stat. § 307.173(1),(2); **Montana**, Mont. Code Ann. § 61-9-405(4)(a); **Nebraska**, Neb. Rev. Stat. Ann. § 60-6,257(1)(a),(b), (2)(a); **Nevada**, Nev. Rev. Stat. Ann. § 484D.440(2)(a), (b), (3)(c); **New Hampshire**, N.H. Rev. Stat. Ann. § 266:58-a(III), (V); **New Jersey**, N.J. Admin. Code § 13:20-1.2(a), (b); **New Mexico**, N.M. Stat. Ann. § 66-3-846.1(B)(1); **New York**, N.Y. Veh. & Traf. Law § 375, 12-a(b); **North Carolina**, N.C. Gen. Stat. Ann. § 20-127(b); **North Dakota**, N.D. Cent. Code Ann. § 39-21-39(4); **Ohio**, Ohio Rev. Code Ann. § 4513.241(G), Ohio Administrative Code Rule 4501-41-03(A); **Oklahoma**, Okla. Stat. Ann. tit. 47, § 12-422(D)(11); **Oregon**, Or. Rev. Stat. Ann. § 815.221(3); **Pennsylvania**, 75 Pa. Stat. and Cons. Stat. Ann. § 4524(e); **Rhode Island**, 31 R.I. Gen. Laws Ann. § 31-23.3-2; **South Carolina**, S.C. Code Ann. § 56-5-5015(B); **South Dakota**, S.D. Codified Laws §§ 32-15-2.4, 32-15-2.9; **Tennessee**, Tenn. Code Ann. § 55-9-107(B); **Texas**, Tex. Transp. Code Ann. § 547.613(b); **Utah**, Utah Code Ann. § 41-6a-1635(1)(a), (3)(a); **Vermont**, Vt. Stat. Ann. tit. 23, § 1125(a), c); **Virginia**, Va. Code Ann. § 46.2-1052(B); **Washington**, Wash. Rev. Code Ann. § 46.37.430(5); **West Virginia**, W. Va. Code Ann. § 17C-15-36a(a), (b); **Wisconsin**, Wis. Admin. Code § 305.34(6); **Wyoming**, Wyo. Stat. Ann. § 31-5-962(m); **Washington, D.C.,** D.C. Code Ann. § 50-2207.02(a)(1). Additionally, Federal Motor Vehicle standards set the minimum amount of visible light transmission for windshields at 70% visible light transmission, below the AS1 line. *See* Federal Motor Vehicle Safety Standard FMVSS No. 205, available at https://www.ecfr.gov/current/title-49/subtitle-B/chapter-V/part-571/subpart-B/section-571.205; *see also* National Highway Traffic Safety Administration, Interpretation ID: 11-000697_Trooper_Kile_205 (explaining windshield tinting standards and AS1 line under FMVSS No. 205), *available at* https://www.nhtsa.gov/interpretations/11-000697trooperkile205.

of Paragraph 4 has no requirement that the vehicle with tinted windows be operating within a highway of the State or that the vehicle be required to be registered in Maryland.

Here the evidence establishes that, while patrolling a high-crime area in Southern Maryland, and knowing that motorists in Central and Southern Maryland frequently attempt to circumvent laws requiring insurance of vehicles by registering their vehicles in Virginia, the officers personally observed the dark tint of the front windshield and on the side windows of the Defendant's vehicle.  (Indeed, subsequent tint-meter readings of the driver window showed 15-17% visible light transmission, meaning the window was almost completely opaque and well below the light transmittal requirement in Maryland's window tint statute.)   The officers' location in a high crime area, coupled with the knowledge of the common insurance circumvention scheme in that general area, plus their observation of dark tint of the front windshield and side windows, gave them reasonable suspicion to investigate whether Defendant's vehicle violated the Maryland Transportation Code.  And because the language of Paragraphs 3 and 4 of the statute do not require that a vehicle be required to register in the State, it is legally irrelevant which state the vehicle is or appears to be registered in.  Accordingly, based on their location; knowledge, training and experience; and observations of the excessively dark tint, the officers had reasonable suspicion to stop this vehicle and to investigate whether that vehicle was violating the Maryland motor vehicle code.

Contradicting the clear language and structure of the statute, the Defendant argues that the officers lacked reasonable suspicion to stop him based on his excessively tinted windows and windshield because the vehicle was "facially compliant" with the criminal and traffic codes.  The Defendant mistakenly arrives at this conclusion by claiming that his Virginia tags immunized him from investigation because, in his view, "§ 22-406(i) does not apply to cars that are registered out

21

of state." *See,* ECF No. 23 at 14.  Specifically, Defendant argues that, because Paragraph 1 of the statute specifically references some types of vehicles registered in Maryland (but not all), then all following paragraphs of the statute require Maryland registration.  Neither the language of the statute, nor its structure support that reading.

### iii.  State and federal courts reject Defendant's reading of the Maryland tint statute.

And even assuming, arguendo, that the Maryland tint statute applies only to vehicles that are, or should be registered in Maryland, State and federal caselaw contradicts the Defendant's argument that his out-of-state registration automatically renders the traffic stop unlawful.  A review of these prior cases demonstrates that they are all consistent with the lawfulness of the stop in this case.  The key distinguishing question between the cases is: what information did the officers have at the time of the stop, such that the stop was reasonable or unreasonable at its inception? *See*, *United States v. Brandon*, No. CR ELH-22-0239, 2023 WL 6961937, at *21 (D. Md. Oct. 19, 2023) (adopting this analytical framework).

Most on point is *Baez v. State*, in which the Maryland Court of Special Appeals held that an officer had reasonable suspicion to stop a vehicle with suspected illegal window tint and a Virginia registration in the state of Maryland for violating the Maryland window tint statute.  *Baez v. State*, 192 A.3d 945, 950 (Md. Ct. Spec. App. 2018).  In that case, the defendant's vehicle had excessive window tint, and the parties stipulated that the defendant's car was registered in Virginia. The question, therefore, was whether a stop of the vehicle was reasonable given the excessive window tints and out-of-state registration.  The Court of Special Appeals held that it was.  *Id.* at 950.  The Court of Special Appeals explained:

> The purpose of a stop based upon reasonable suspicion "is to confirm or to dispel that suspicion by asking for an explanation of the suspicious behavior." *Muse* [*v. State*, 807 A.2d 113, 119 (Md. Ct. Spec. App. 2002).]  A police officer, suspecting a tint window violation, may lawfully stop a vehicle to investigate further and ask

> to see the vehicle registration to determine origin of registration. That the vehicle may be registered in a foreign jurisdiction does not vitiate the lawfulness of the stop.

*Baez v. State*, 192 A.3d at 951. Thus, officers had reasonable suspicion to stop the defendant's vehicle in Maryland and determine whether the vehicle had valid out-of-state registration to confirm or dispel their suspicions. (And as a factual matter, this is especially true, in a region like Maryland, where motorists regularly register their vehicles in another jurisdiction to avoid paying insurance.)

The Court of Special Appeals affirmed *Baez* in a case in which the defendant's vehicle had a temporary West Virginia registration. *Redd v. State*, 2018 WL 6181703, at *5 (Md. Ct. Spec. App. Nov. 27, 2018). There, the Court of Special Appeals held that the officers had reasonable suspicion to stop the defendant's vehicle when, among other reasons, they had reasonable suspicion that the window tints on his vehicle were too dark and officers knew the temporary West Virginia registration was not valid. *Id.*

Similarly, in *United States v. Devonta Johnson*, Judge Grimm found that law enforcement's stop of the defendant, whose vehicle bore temporary Virginia registration plates with unknown validity, was lawful based on the Maryland window tint statute. *See United States v. Devonta Tawain Johnson*, No. PWG 21-CR-171, 2021 WL 5882570, at *1 (D. Md. Dec. 13, 2021). In that case, the officer stopped the defendant after noticing his suspected excessive window tint. *Id.* There, like in this case, the officer had limited information regarding the vehicle. When the offer initiated the stop, he knew that the defendant's vehicle had temporary Virginia registration plates and had radioed a teammate to verify whether the registration was valid, but did not know the answer to that question prior to stopping the defendant. *Id.* And like this case, the stop took place in a high crime area in Maryland near the Washington, DC border. *Id.* Under these circumstances,

the Court held that it was reasonable for law enforcement to briefly stop the defendant to check his temporary out-of-state registration to determine whether the vehicle was validly registered in Virginia and confirm or dispel their suspicions. *Id.* As Judge Grimm explained,

> [T]he display of a temporary out-of-state license on a vehicle is relevant to whether that vehicle in fact is validly licensed in the out-of-state jurisdiction, as the Court of Special Appeals discussed in *Baez. See* 192 A.3d at 950-51. And that fact, combined with the extreme darkness of the window tinting, the location of the automobile near the border of Prince George's County and Washington D.C., in a high-crime area that was being patrolled by the Special Assignment Team was sufficient to justify a *Terry* stop for the limited purpose of verifying whether Mr. Johnson's vehicle was validly registered in Virginia.

*United States v. Devonta Johnson*, No. 21-CR-171-PWG, 2021 WL 5882570, at *1. Judge Grimm affirmed his decision in a letter order following supplemental briefing. See *Devonta Johnson*, 21-171-PWG, Dkt. No. 60 (D. Md. Jan. 26, 2022).

Judge Hollander's recent decision in *United States v. Brandon* echoed Judge Grimm's reasoning in *Devonta Johnson*. *See* 2023 WL 6961937, at 21. In *Brandon*, a law enforcement officer in a high crime area in Baltimore stopped a vehicle that bore Pennsylvania dealer tags and had windows and windshield so highly tinted that the officer could not determine how many persons were in the vehicle. 2023 WL 6961937, at 9. Judge Hollander swiftly rejected the defendant's argument that law enforcement had no legal basis for the stop because the vehicle had Pennsylvania tags and was therefore not subject to Maryland's tint law. *See, Brandon*, 2023 WL 6961937 at 2. She "concluded that the stop itself was lawful under *Terry*, based on the officer's belief that the tint was illegal." *Id.* at 31.

Here, like in *Brandon, Devonta Johnson*, *Baez*, and *Redd*, law enforcement suspected the Defendant's vehicle had illegal window tints. In this case, the officers had even greater cause for suspicion, given that in addition to the side windows, the Defendant's front windshield was tinted, which is illegal not only in Maryland but in all 50 states and the District of Columbia. And like

*Brandon*, *Devonta Johnson*, *Baez*, and *Redd*, in which the officers had knowledge that an out-of-state registration was displayed, here, the Defendant's vehicle – in Maryland – bore out-of-state plates. Therefore, the lawfulness of the stop is as clear here as it was in those cases.

The Defendant's main argument to the contrary is that the decisions in *United States v. Frank Johnson*, 256 F.3d 214 (4th Cir. 2001) and *United States v. Brooks*, 679 F. Supp. 3d 225, 229 (D. Md. 2023) require a finding that the Defendant's stop was unconstitutional at inception. In *Frank Johnson*, the Fourth Circuit interpreted the South Carolina window tint statute to only apply to vehicles required to be registered in South Carolina and found that, *without more*, South Carolina officers did not have reasonable suspicion to stop a vehicle with Georgia plates in South Carolina for a suspected violation of the South Carolina window tint statute.

*Frank Johnson* can be distinguished from the case at hand for at least two reasons. First, the South Carolina statute at issue in *Frank Johnson*, S.C. Code Ann. § 56–5–5015, is very different from the Maryland window tinting statute, Md. Code, Transp. § 22-406(i). As explained above, the language and the structure of Maryland's window tinting establish that statute does not only apply to vehicles required to be registered in Maryland. *See*, *e.g*., Md. Code, Transp. § 22-406(i)(3)("A person may not install on a window of a vehicle any window tinting material that does not comply with the [35%] light transmittance requirement[]"). Second, the Fourth Circuit's holding in *Frank Johnson* that the officer lacked reasonable suspicion to believe that the vehicle was required to be registered in South Carolina was premised on the officer's belief of the illegality of the tint, without more. Here, the circumstances are very different. Cpl. Wigmore stopped the Defendant's car: (1) while patrolling a high crime area in Southern Maryland; (2) after observing the excessively dark tint of the vehicle's windows and front windshield; and (3) aware that that

motorists in Central and Southern Maryland frequently attempt to circumvent Maryland insurance laws by registering their vehicles in the Commonwealth of Virginia.

These additional facts establish that this case is less like *Frank Johnson*, and more like *Brandon, Devonta Johnson*, *Baez*, and *Redd*, where, in addition to the dark tint, additional factors—such as presence in a high crime area and invalid or unverified registration—were present. *See also*, *United States v. Walker-Bay*, 800 F.Appx. 161 (4th Cir. 2020) (per curiam) (holding that the district court did not err in crediting testimony of officer who believed that the defendant's windows were darker than allowable under Maryland law and knew that two weeks earlier the same vehicle had been issued a repair order for exceeding legal limit of window tints). Because the law and the facts are fundamentally different in this case, the Court is not bound by the Fourth Circuit's decision in *Frank Johnson.*

Judge Chuang's decision in *United States v. Brooks* is not applicable for similar reasons. In *Brooks*, law enforcement officers patrolling a high crime area stopped the defendant's vehicle, which had excessively tinted windows and windshield and no front license plate, after observing the defendant make furtive movements and reaching to the floorboard while in the vehicle. *United States v. Brooks*, 679 F. Supp. 3d 225, 228-29 (D. Md. 2023).  Notwithstanding binding Fourth Circuit precedent instructing lower courts that "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient," *George*, 732 F.3d 299-300, the Court in *Brooks* proceeded to refute each of the factors cited by law enforcement as bases for the stop. *See, Brooks*, 679 F. Supp. 225–240.  And as part of that piecemeal refutation, the Court in *Brooks* assumed, without discussing, that the Maryland window tinting statute only applied to vehicles required to be registered in Maryland, concluding that "the officers lacked reasonable suspicion to justify the traffic stop based on the window tinting because they had no

facts supporting a reasonable suspicion that the vehicle was or was required to be registered in Maryland." *United States v. Brooks*, 679 F. Supp. 3d 225, 238 (D. Md. 2023).

The Defendant also likens this case to a suspicion-free spot check for license and registration compliance, citing the Supreme Court's decision in *Delaware v. Prouse*, 440 U.S. 648, 654, 653 (1979) and the Fourth Circuit's decision in *United States v. Feliciana*, 974 F.3d 519, 523 (4th Cir. 2020). A comparison to those cases is inapt. In *Prouse*, the Supreme Court held that a random stop of a motorist without specific articulable facts to justify the stop except a desire to check the driver's license and registration violated the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. at 650, 661–63. Similarly, in *Feliciana*, the Fourth Circuit held that a stop of a bakery delivery truck driving on the George Washington Parkway with no specific articulable facts to justify the stop except a desire to check if the driver had the required commercial vehicle permit violated the Fourth Amendment. *United States v. Feliciana*, 974 F.3d at 523–24.

Here, the officers observed a vehicle, in a high crime area in Maryland, with tint on its front windshield (which is illegal in all 50 states and the District of Columbia), and tint on the side windows that was so dark the windows were almost opaque. This is simply not, as the Defendant suggests, a case where there was a "facially compliant car." The circumstances of *Prouse* and *Feliciana* simply do not apply.

Rather, the officers had reasonable, articulable suspicion that the Defendant may be violating the Maryland motor vehicle code, and therefore could lawfully stop the Defendant to confirm or dispel their suspicions. The Fourth Amendment does not allow for less, but it does not require more. And even if the officers were ultimately incorrect (which they were not, as discussed herein), and their suspicions were dispelled, that still does not amount to a Fourth Amendment violation. That is the integral to the very purpose of a *Terry* stop. The Fourth Circuit explained:

> As we have previously stated, "the very point of *Terry* was to permit officers to take preventive action and conduct investigative stops *before* crimes are committed, based on what they view as suspicious-albeit even legal-activity." *United States v. Perkins,* 363 F.3d 317, 326 (4th Cir.2004) (emphasis in original). "We cannot afford to read the Fourth Amendment to require officers to wait until criminal activity occurs, and perhaps until innocent bystanders are physically harmed, before taking reasonable, preventive measures." *Id.* at 328; *see Adams v. Williams,* 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.").

*United States v. Spearman*, 254 F. App'x 178, 182 (4th Cir. 2007).  *See also United States v. Cloud*, 994 F.3d 233, 246–47 (4th Cir. 2021) ("[I]n the end, '[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy, for ... '[t]o be reasonable is not to be perfect.'" (quoting *Kansas v. Glover*, 589 U.S. ——, 140 S. Ct. 1183, 1188, 206 L.Ed.2d 412 (2020)).

### iv.  The good faith exception applies.

Even if the Court finds that officers lacked reasonable suspicion to stop the Defendant based on the Maryland window tint statute or the Maryland unsafe vehicle statute, in totality with the other bases for the stop discussed herein, such that a Fourth Amendment violation occurred, the Defendant's motion to suppress still should be denied based on the good faith exception to the exclusionary rule.  The Supreme Court has squarely held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis v. United States*, 564 U.S. 229, 232, 239–41 (2011).  Here the Maryland Court of Special Appeals' decision in *Baez* constitutes binding appellate precedent, and the officers acted in accordance with that decision.  Therefore, the Defendant's stop was conducted in objectively reasonable reliance on binding appellate precedent, and the exclusionary rule does not apply.

The Supreme Court's discussion of the exclusionary rule in *Davis* is instructive.  The Supreme Court explained that "[e]xclusion is 'not a personal constitutional right,' nor is it designed

to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. at 236 (quoting *Stone v. Powell,* 428 U.S. 465, 486 (1976)). Rather, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations." *Id.* at 236–37. Therefore, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* at 237 (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)). Even when there is "[r]eal deterrent value" for exclusion, a Court must also account for the "substantial social costs" of the rule. *Id.* This is because "[e]xclusion exacts a heavy toll on both the judicial system and society at large" given that it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* Indeed, "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* Thus, the Supreme Court's cases hold that "society must swallow this bitter pill when necessary, but only as a 'last resort.'" *Id.* (quoting *Hudson v. Michigan,* 547 U.S. 586, 591 (2006)). Therefore, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.*

To determine the deterrent benefits of exclusion, the Court must analyze the "culpability of the law enforcement conduct at issue." *Id.* at 238 (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)) (internal quotation marks omitted). The Supreme Court explained:

> When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. [*Herring*, 555 U.S. at 144]. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, [*United States v. Leon*, 468 U.S. 897, 909 (1984)] (internal quotation marks omitted), or when their conduct involves only simple, "isolated" negligence, *Herring, supra,* at 137, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way," *Leon, supra,* at 919, 908, n.6 (quoting *United States v. Peltier,* 422 U.S. 531, 539 (1975)).

*Davis v. United States*, 564 U.S. at 238.

In *Davis*, the Supreme Court considered a search of an automobile incident to arrest that pre-dated the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009).  Following *Gant*, there was no question that the search that took place in *Davis* was unconstitutional.  But at the time of the search, the Eleventh Circuit had interpreted the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454 (1981), to establish a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  *See United States v. Gonzalez*, 71 F.3d 819, 822, 825 (11th Cir. 1996).  The Supreme Court noted that the officers in *Davis* "followed the Eleventh Circuit's *Gonzalez* precedent to the letter" and that "the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way." *Davis v. United States*, 564 U.S. at 239–40.  Thus, the Supreme Court found that the officers' actions were neither "deliberate enough to yield meaningful deterrence" nor "culpable enough to be worth the price paid by the justice system." *Id.* at 240 (internal quotation marks and alterations omitted).  The officers were not deliberate, reckless, or grossly negligent in violating Davis' Fourth Amendment rights. *Id.*  To the contrary, "[t]he police acted in strict compliance with binding precedent, and their behavior was not wrongful." *Id.*  Therefore, the exclusionary rule did not apply. *Id.*

The same is true here.  At the time the officers initiated the stop and began their encounter with the Defendant, the officers' actions were authorized by *Baez v. State*, 192 F.3d 945, 951 (Md. Ct. Spec. App. 2018).  *Baez* constitutes binding appellate precedent.  *See Archers Glen Partners, Inc. v. Garner*, 933 A.2d 405, 424 (Md. Ct. Spec. App. 2007) (explaining that a "reported decision" of the Maryland Court of Special Appeals "constitutes binding precedent"); *United States v. Devonta Johnson*, 2021 WL 5882570, at *1 (citing *Archers Glen Partners* and finding that the *Baez* opinion constituted binding appellate precedent); *see also United States v. Wilford*, 961 F. Supp. 2d 740, 764–65 (D. Md. 2013), *on reconsideration in part* (Nov. 27, 2013) (Hollander, J.)

(citing *Archers Glen Partners* and noting that for the purposes of the good faith exception to the exclusionary rule, published Maryland Court of Special Appeals opinions constitute binding appellant precedent), *aff'd*, 689 F. App'x 727 (4th Cir. 2017).

In *Devonta Johnson*, Judge Grimm asked for supplemental briefing on the issue of the good faith exception following his initial ruling denying the Defendant's motion to suppress.  Judge Grimm then affirmed his ruling and found that the stop of the defendant was lawful under the Maryland window tint statute, and alternatively that the good faith exception would apply.  *See Devonta Johnson*, 21-171-PWG, Dkt. No. 60, at *2 (D. Md. Jan. 26, 2022).  As Judge Grimm explained: "There is no deterrence effect to exclude evidence obtained by an officer who relied on a published Maryland Court of Special Appeals opinion (a final opinion under Maryland law), any more than there is a deterrence effect to exclude evidence obtained by an officer who relied on a trial judge issuing a warrant or on a database that had bad data.)."  *Id.*  Thus, although not binding appellate precedent in its own right, following Judge Grimm's decision in *Devonta Johnson*, there is even less deterrent value in excluding evidence where the officers are acting in objectively reasonable reliance on binding appellate precedent from the Maryland Court of Special Appeals, which was then affirmed to be lawful by this Court.  In other words, there is no deterrent value in applying the exclusionary rule in this context, as exclusion would only deter law enforcement from following binding Maryland precedent and decisions from this Court.  Therefore, the "harsh result" of exclusion, saved only for "last resort," does not apply and the good faith exception to the exclusionary rule does.  *Id.* at 237.

Importantly, in *Brandon*, Judge Hollander recently concluded that, when an officer relied on *Baez* in the context of a traffic stop involving a tint and an out-of-state registration, "the officer acted in objectively reasonable reliance on Maryland statutory law and binding judicial precedent.

To invoke the sanction of exclusion here would fly in the face of *Davis*, 564 U.S. at 239–41, because of the absence of culpability by the police officer." 2023 WL 6961937 at 25.

And to the extent that the Defendant may seek to rely on *Brooks*'s analysis on this issue, the Government respectfully submits that the analysis in *Devonta Johnson* and *Brandon* is applicable here, whereas the one in *Brooks* is not.  In *Brooks*, Judge Chuang found that the holdings of *Baez* and the Fourth Circuit's decision in *Frank Johnson* were in direct conflict, and declined to apply the good faith exception because, in his view, there was no binding appellate precedent. 679 F. Supp.3d 225, 239–240.  But as explained above, the Fourth Circuit's decision in *Frank Johnson*, which interpreted a different statute of a different state, is distinguishable and not incompatible with the decisions from *Baez¸ Devonta Johnson*, and now *Brandon*, where courts in Maryland interpreted a Maryland statute.  *See, Brandon* 2023 WL 6961937 at 25 ("The Fourth Circuit's decision in *Frank Johnson* concerned a South Carolina statute. . . . [T]he decision of the Maryland Court of Special Appeals in *Baez* is factually distinguishable from the Fourth Circuit's *Frank Johnson* decision.  Under *Baez,* decided seventeen years after the Fourth Circuit's decision in *Frank Johnson*, 256 F.3d 214, Maryland law permits a police officer who suspects a window tint violation to stop a vehicle with an out-of-state license to investigate where the vehicle is registered, without vitiating the lawfulness of the stop.") (citations omitted).

To the extent that law enforcement violated the Fourth Amendment in stopping the Defendant's vehicle, this Court should nevertheless follow the lead of Judge Grimm and Judge Hollander and hold that the good faith exception to the exclusionary rule applies.

## II.    The Defendant Consented to the Pat Down Frisk.

A law enforcement officer is entitled to conduct a frisk and limited search for weapons if reasonable suspicion to stop a suspect exists and the officer reasonably believes the defendant may

be armed and dangerous. *United States v. George*, 732 F.3d 296, 299–302 (4th Cir. 2013) (approving frisk of an individual based on reasonable suspicion that he was armed and dangerous), *cert. denied,* 572 U.S. 1009 (2014); *United States v. Mayo*, 361 F.3d 802, 807 (approving stop based on reasonable suspicion, and patdown frisk based on reasonable belief that the suspect may be armed and dangerous).  But "[v]alid consent is a well-recognized exception to the Fourth Amendment." *United States v. Neely*, 564 F.3d 346, 349 (4th Cir. 2009).  Law enforcement is free to conduct a pat down frisk if an individual consents "freely and voluntarily," *Bumper v. North Carolina*, 391 U.S. 543, 548–549 (1968), in light of the "totality of the circumstances," *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996).

Here, the Defendant argues that Cpl. Wigmore's frisk was illegal because she did not have a reasonable basis to suspect that he was armed and dangerous.  But the evidence clearly shows that the Defendant consented to the search.  As explained above, when the Defendant exited his vehicle, Cpl. Wigmore asked if she could pat him down for safety reasons ("Do you mind if I check to make sure that you don't got a knife or a syringe or an axe on you?  You okay with that?") to which the Defendant affirmatively responded "yeah." Moreover, the circumstances of the Defendant's response further confirm that he freely and voluntarily consented to the patdown frisk. At the time of the stop, the Defendant was 29 years old and was approximately 6 feet 2 inches tall. Additionally, the Government expects a law enforcement witness to testify during the evidentiary hearing, and the evidence to show, that on that day and at the time of the stop, the Defendant

appeared to be of average intelligence and maturity; to be alert and aware of his surroundings, and to speak and understand the English language.

Because the Defendant clearly consented to the pat-down, because that consent was freely and voluntarily given in light of the totality of the circumstances, and because the Defendant has failed to identify any conditions that would render his consent forced or involuntary, this Court should dismiss the Defendant's motion to suppress, ECF. No. 23.

### III.    Defendant's Statements are Admissible.

The Government intends to introduce statements made by the Defendant during the traffic stop and after law enforcement advised him of his *Miranda* rights.  We examine each in turn.

#### c.    The Defendant was not in custody during the traffic stop.  His statements are therefore admissible.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V. In *Miranda v. Arizona*, the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation. 384 U.S. 436, 467-74, 478-79; *Dickerson v. United States*, 530 U.S. 428, 435 (2000). Ordinary traffic stops are noncoercive and therefore "persons temporarily detained are not in custody for the purposes of *Miranda*."  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *see also, United States v. Sullivan*, 138 F.3d 126, 130-31 (4th Cir. 1998) ("while a motorist during a routine traffic stop is detained and not free to leave, the motorist is not in custody for *Miranda* purposes."); *United States v. Leggette*, 57 F.4th 406, 410 (4th Cir. 2023) ("so long as a defendant is not in custody, then statements made during an interrogation remain admissible, even if the defendant were not given *Miranda* warnings")(internal quotations omitted).  Moreover, "drawing weapons,

handcuffing a suspect, placing a suspect in a patrol car for questioning or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes." *United States v. Leshuk*, 65 F.3d 1105, 1110 (4th Cir. 1995).

But "*Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." *Leshuk*, 65 F.3d 1108–09. After a court finds that a stop was justified in its inception, the key question is whether law enforcement's "subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011); *see also, United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015). Absent reasonable suspicion of additional criminal activity, the scope of a routine traffic stop is limited. "In carrying out a routine traffic stop, a law enforcement officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. Any further detention for questioning is beyond the scope of the *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998). However, unrelated questions from law enforcement that do not prolong a stop or represent a *de minimis* delay do not violate the Fourth Amendment. *United States v. Mason*, 628 F.3d 123, 132 (4th Cir. 2010) ("The one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern.").

Here, the evidence shows that any questioning of the Defendant and any statements of the Defendant in response to law enforcement's questions were within the scope of the routine traffic stop. And to the extent that any questioning was not within the scope of the stop and such questioning delayed the stop, such a delay was *de minimis* and therefore not in violation of the Fourth Amendment. Specifically, the footage shows that the traffic stop lasted approximately four

or five minutes.  Cpl. Wigmore effectuated the stop at approximately 12:35:36 p.m. and—after requesting the Defendant's driver's license and registration, running a computer check, and learning that the Defendant's vehicle was not insured—decided to impound the vehicle and notified the Defendant that she would be impounding his vehicle at approximately 12:39:10 ("You can't drive a car without insurance.  And you can't have the front windshield tint, okay?  I can't let you.  You end up becoming a hazard to everyone on the road.  You got, are you able to have someone pick you up from here? . . . So, I'm going to tow your car today.).

During the first couple of minutes of the stop, the Defendant disclosed that his windows and windshield were tinted to allow light transmittance of 20 % ("They are 20%, though" [Exhibit 1, 12:35:42]; "I didn't know that 20% was illegal" **[Exhibit 2, 12:37:40]**), which was way below the minimum prescribed 35% by Maryland law.  And moments later, while Cpl. Wigmore was running a computer check on his license and registration, the Defendant disclosed to Officer Guevara that he had registered his Vehicle in Virginia in order to not have to pay for insurance ("It's an older car, so I didn't feel like paying for insurance.  It's an '07, you know what I'm saying?  So I didn't want to pay for insurance."; "There's no insurance on it.  That's why I went to Virginia and got the tag.  I just got the car the other day." [Exhibit 2, 12:37:38 to 12:38:26]).  Accordingly, because the Defendant made these and other statements during the short duration of the traffic stop, and because during that traffic stop the Defendant was not in custody for the purposes of *Miranda*, his statements are admissible.  *See*, *Berkemer*, 468 U.S. 440; *Sullivan* 138 F.3d 130-31; *Legette*, 57 F.4th 410.

And even in the unlikely scenario that the Court finds that the Defendant was in custody at some point during the traffic stop, and therefore *Miranda* applied, the Court should nevertheless find that at least some of the Defendant's statements—and particularly the statements that the

36

Defendant made to Officer Guevara regarding his lack of insurance—were voluntary.  Statements volunteered by a defendant while he is in custody are not implicated by *Miranda*. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility [is not implicated by *Miranda*]." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980, *see also, United States v. Montieth*, 662 F.3d 660, 669 (4th Cir. 2011) (affirming district court finding that defendant's pre-*Miranda* statements to law enforcement admitting that he had marijuana in his house were voluntary).

### d.  Law Enforcement Properly Advised the Defendant of his *Miranda* Rights.

In *Miranda*, the Supreme Court held that before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect, in substance, that he has the right to remain silent, that his statements may be used against him at trial and that he has the right to an attorney during questioning. 384 U.S. at 478-79.  Moreover, *Miranda* and its progeny do not require that police officers provide highly particularized warnings since "[s]uch a requirement would pose an onerous burden on police officers to accurately list all circumstances in which *Miranda* rights might apply."  *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996). All that is required is for the police officers to "convey the general rights enumerated in *Miranda*."  *Id.*

Assuming, arguendo, that the Defendant was in custody after Cpl. Wigmore located the firearm and the Defendant was placed in handcuffs, Cpl. Clark properly advised the Defendant of all his *Miranda* rights.  Cpl. Clark informed the Defendant that he had a right to remain silent ("Mr. Leonard, you do have a right to remain silent.").  Cpl. Clark informed the Defendant that his statements could be used against him at trial ("Anything you say or write may be used against you in a court of law").  Cpl. Clark informed the Defendant that he had a right to an attorney during questioning ("You have the right to talk to a lawyer before answering any questions and to have a

lawyer present at any time before or during questioning. . . . If you agree to answer questions, you may stop at any time and request the assistance of a lawyer, and no further questions will be asked of you.").  Lastly, Cpl. Clark advised the Defendant that the state would appoint an attorney for him if the Defendant could not afford one ("If you now want the assistance of a lawyer but cannot afford to hire one, you will not be asked any more questions at this time, and you may request the court to appoint a lawyer for you without charge.").

The Defendant claims that Cpl Clark did not ask whether he waived *Miranda* rights but cites no legal authority requiring that question.  In fact, "all that is required is for the police officers to "convey the general rights enumerated in *Miranda*."  *Frankson*, 83 F. 3d. 82.  Accordingly, because Cpl. Clark properly advised the Defendant of his *Miranda* rights, any statements that the Defendant made to law enforcement thereafter are admissible.

### IV.    Law Enforcement Properly Impounded the Defendant's Vehicle and Conducted an Inventory Search.

Lastly, the Defendant claims that the officer's decision to impound the Defendant's car was not justified.  The facts and the law show the opposite is true.  Cpl. Wigmore and the members of her squad followed all the relevant laws and orders governing the impoundment and inventory of the Defendant's car.  Accordingly, the Defendant's motion to suppress evidence on this basis should be denied.

"An inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017); *See also*, *United States v. Brown*, 787

F.2d 929, 932 (4th Cir. 1986) (affirming district court's denial of motion to suppress relating to impound inventory search and finding that police properly exercised discretion to impound the defendant's vehicle under the circumstances).

Division 18 of subtitle 26 of Prince George's County's ordinances governs impoundments of vehicles in the County.  Section 26-166 therein specifies, in relevant part:

> (a) A vehicle subject to impoundment under any provision of Federal, State, or local law may be impounded without giving prior notice to its owner under the following circumstances:
>
> (1) When the vehicle is impeding or is likely to impede the normal flow of vehicular or pedestrian traffic; or
> . . .
> (3) When the vehicle imposes an immediate danger to the public safety; or
> . . .
> (6) When the operator of the vehicle has been taken into custody and impoundment of the vehicle is reasonably necessary to provide for the safekeeping of the vehicle . . .

Prince George's Cty., Md. Code of Ordinances (§) 26-166 (2023).

Additionally, Volume II, chapter 36 of the Prince George's County Police Department General Order Manual ("GOM"), titled "Impounds and Vehicles", instructs officers that "vehicles with defective, deficient, or altered equipment may be impounded only if the continued operation of the vehicle poses a hazard to its operator or the public."  It further instructs, "[w]hen officers impound vehicles, they shall . . . [i]nclude an inventory list and note the condition of the vehicle" and "[s]ubmit all money from the vehicle to the Evidence and Property Management Warehouse." GOM, Vol. II, Ch. 24, page 1.

Here, the impoundment was proper because (1) the circumstances of the stop reasonably justified the impoundment of the Defendant's vehicle; and (2) law enforcement conducted the

inventory search according to routine and standard procedures designed to secure the vehicle or its contents. *Bullette*, 854 F.3d 265.

The evidence shows that Cpl. Wigmore and the members of her squad properly and reasonably decided to impound the Defendant's vehicle after deeming it unsafe.  In fact, within the first minute of the stop, Cpl. Wigmore advised the Defendant that she deemed his vehicle to be unsafe both for the Defendant and the public, and in violation of the Maryland Transportation Code  ("[Y]our tint is *so* dark, sir. . . . But you can't have no front windshield tint.  This is like, this is illegal in Maryland. This is deemed an unsafe motor vehicle. . . .  There is no way at night that you can drive safely and see out of this").  Based on that reason alone, Cpl. Wigmore was entitled to impound the vehicle. *See,* Prince George's Cty., Md. Code of Ordinances (§) 26-166 (2023)( authorizing impoundment without notice of "vehicle*s* with defective, deficient, or altered equipment may be impounded only if the continued operation of the vehicle poses a hazard to its operator or the public."); *see also* GOM ("vehicles with defective, deficient, or altered equipment may be impounded only if the continued operation of the vehicle poses a hazard to its operator or the public.").[6]  She even advised the Defendant that she could impound the vehicle ("We can tow the car for front windshield tint, alright?", Exhibit 1, 12:37:50).  And after learning that the Defendant had not insured a vehicle, any doubt that Cpl. Wigmore harbored about impounding the vehicle dissipated ("You can't drive a car without insurance.  And you can't have the front windshield tint, okay?  I can't let you.  You end up becoming a hazard to everyone on the road. You got, are you able to have someone pick you up from here? . . . So, I'm going to tow your car

---

[6] And because the vehicle was unsafe, given it's location, the vehicle was "likely to impede the normal flow of vehicular or pedestrian traffic"  Prince George's Cty., Md. Code of Ordinances (§) 26-166 (2023).

today.").   Therefore, after deeming the vehicle unsafe to the Defendant, as the operator, and to public, Wigmore properly and reasonably decided to impound the Defendant's vehicle.

Moreover, Cpl. Wigmore and her squad conducted the "inventory search according to routine and standard procedures designed to secure the vehicle or its contents." *Bullette*, 854 F.3d 265.   As specified above, Prince George's County's GOM instructs officers conducting an impound to create "an inventory list" and "[s]ubmit all money from the vehicle" to the evidence warehouse. GOM, Vol. II, Ch. 24, page 1.   The corollary to these requirements is that officers conducting the inventory are not only allowed, but required, to enter the vehicle to locate all money or valuables in the vehicle and to make a record of the items in and the condition of the vehicle .

Cpl. Wigmore and her squad's actions are entirely consistent with these instructions.   As described in the factual background section, after telling the Defendant that she would be impounding his vehicle, Cpl. Wigmore began the impound inventory by opening the front passenger-side door of the vehicle and examining the vehicle's compartments to, among other things, identify any valuables including money.   And in the process of complying with these orders, Cpl. Wigmore and the members of her squad found the Defendant's firearm, the tint receipt, the suspected CDS, and the drug paraphernalia.

The facts and the law demonstrate that the impound and inventory of the Defendant's vehicle was lawful because the circumstances reasonably justified the impoundment and because the inventory search was conducted according to routine and standard procedures designed to

secure the vehicle or its contents.  Accordingly, the Defendant's motion to suppress evidence on this basis should be denied.

## <u>CONCLUSION</u>

The facts and the law establish that law enforcement had reasonable suspicion to stop the Defendant, that the Defendant consented to be frisked, and that law enforcement properly impounded his vehicle.  The facts and the law also establish that law enforcement was not required to *Mirandize* the Defendant, that law enforcement's questions were well within the duration and scope of the traffic stop, and that the Defendant's statements to law enforcement were either voluntary or made after he was properly advised of his *Miranda* rights.  The Defendant's motions to suppress evidence and statements, ECF Nos. 22 and 23, should therefore be denied.

Respectfully submitted,

Erek L. Barron
United States Attorney

    /s/
_____
H. Gustavo Ruiz
Special Assistant United States Attorney

Joel Crespo
Assistant United States Attorney

42