# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Crim No.  23-cr-00441** |
| **DEJUAN LEONARD,** | * | |
| **Defendant** | * | |

\* \* \* \* \* \* \* \* \* \*

## REPLY IN SUPPORT OF MR. LEONARD'S MOTION TO SUPPRESS

## <u>TABLE OF CONTENTS</u>

I.   Mr. Leonard was subject to an unconstitutional traffic stop....................................... 1

   A.   Cpl. Wigmore lacked reasonable suspicion to believe Mr. Leonard was violating
      Maryland's window-tint statute. ..................................................................... 2

     1.   Fourth Circuit precedent definitively establishes the illegality of this stop.................. 2

     2.   The government's interpretation of § 22-406 is wrong. ............................... 6

     3.   Cpl. Wigmore had no facts to support a reasonable suspicion that the Hyundai was
        required to be registered in Maryland. .......................................................... 9

     4.   *Frank Johnson* and *Brooks* are directly on point. ......................................... 12

     5.   *Brandon* and *Devonta Johnson* are distinguishable.................................... 13

   B.   The Maryland Unsafe Vehicle Statute does not establish reasonable suspicion........... 14

   C.   The *Davis* good-faith exception to the exclusionary rule does not apply in this case. .. 17

     1.   *Davis* recognized a narrow exception to the exclusionary rule for "objectively
        reasonable reliance on binding appellate precedent."................................. 17

     2.   *Baez* is not the kind of binding appellate precedent on which police officers could
        reasonably rely. ............................................................................................ 18

II.   The frisk of Mr. Leonard was illegal. ................................................................... 24

III.   The impoundment and inventory search of Mr. Leonard's car were illegal......................... 25

   A.   There was no lawful basis to impound Mr. Leonard's car............................................ 26

   B.   Even were impound permitted, the "inventory search" was unlawful.......................... 29

IV.   CONCLUSION........................................................................................................... 30

## INTRODUCTION

On September 12, 2023, Dejuan Leonard was illegally stopped by an aggressive Prince George's County Police Department unit dedicated to "proactive policing." From the illegal stop flowed a cascading series of constitutional violations. For the following reasons, suppression is the proper remedy.

## ARGUMENT

The government presents a long list of counterarguments in an attempt to justify Mr. Leonard's seizure and the search of his car last September. Each fails.

*First*, there was no basis to believe that Mr. Leonard's car, which was validly plated in Virginia, violated Maryland's window tint statute, and the good faith exception does not apply to the officers' actions.

*Second*, there was no basis to believe the car violated Maryland's "unsafe vehicle" law.

*Third,* officers unlawfully frisked Mr. Leonard. And finally, the impoundment and inventory search of the car were both illegal.

### I.   Mr. Leonard was subject to an unconstitutional traffic stop.

As Mr. Leonard explained in his opening brief, Cpl. Wigmore's traffic stop and subsequent search of Mr. Leonard's vehicle was unconstitutional because the purported basis of the stop—a Maryland statute limiting the tint on car windows—does not apply to cars that are registered in other states. Mr. Leonard's car was registered in Virginia and the government has offered no factual basis for Cpl. Wigmore to doubt that the registration was genuine. As such, there was no basis for Cpl. Wigmore to stop the vehicle.

1

**A.    Cpl. Wigmore lacked reasonable suspicion to believe Mr. Leonard was violating Maryland's window-tint statute.**

Contrary to the government's suggestion, Resp. at 25, this case is squarely controlled by *United States v. Frank Johnson*, 256 F. 3d 214 (4th Cir. 2001).[1] There, the Fourth Circuit held police could not stop a car based on a suspected window-tint violation when they had no basis to believe the car satisfied a condition precedent to application of South Carolina's tinting statute, *i.e.*, that the car "was 'required to be registered' in South Carolina." *Id.* at 216–17. Here, Cpl. Wigmore stopped Mr. Leonard's car based on a suspected window-tint violation even though she had no basis to believe the car satisfied a condition precedent to application of Maryland's tinting statute, *i.e.*, that it was "registered under" the Maryland transportation code. Md. Code. Ann., Transp. § 22-406(i)(l). Under *Frank Johnson*, therefore, the stop was illegal.

This case really is that simple, and the government's arguments to the contrary rest on the misapplication of basic Fourth Amendment principles and a misreading of the Maryland Transportation Code.

**1.    Fourth Circuit precedent definitively establishes the illegality of this stop.**

In *Frank Johnson*, a South Carolina state trooper stopped Johnson's car, which displayed a Georgia license plate, because he believed it "was not in compliance with South Carolina's 'window tinting' law." *Frank Johnson*, 256 F.3d at 215. A subsequent search of the car turned up two kilograms of cocaine, and Johnson moved to suppress on the ground that the stop was unlawful. *Id.* at 215–16.

---

[1] Unless otherwise indicated, quotations in this Reply omit citations, brackets, internal quotation marks, and other characters that do not affect the meaning of the cited language.

South Carolina's window-tint statute provided that "[n]o person may operate a motor vehicle that is required to be registered in South Carolina on any public highway, road, or street" unless the "sunscreen device[s]" on the windshields met certain light-transmission requirements. *Id.* at 216 n. 1. (emphasis added). So, the *Frank Johnson* court explained, the stop of Johnson's car was lawful only if the trooper "possessed some minimal level of objective justification to believe that: (1) Johnson was operating a motor vehicle 'on any public highway, road, or street'; (2) Johnson's vehicle was required to be registered in South Carolina; and (3) the 'sunscreen device' on one of the vehicle's windows did 'not meet the requirements' of the statute." *Id.* at 216.

There was no dispute that the first and third elements were met, but the Court held the trooper "had no reasonable suspicion to believe that the automobile was 'required to be registered' in South Carolina." *Id.* Vehicles belonging to "'a nonresident'"—e.g., someone living in Georgia—were not required to be registered in South Carolina, unless that person subsequently established a domicile in the state or operated the vehicle there for more than 150 days. *Id.* at 216–17. And no information available to the trooper at the time of the stop suggested Johnson fit within either of these categories: "while the Georgia plate established that the car was not registered in South Carolina, it provided no information whatsoever about whether the car was *required* to be registered in South Carolina." *Id.* at 217 (emphasis in original). Simply put, "[t]he mere display of a license plate from another state is not relevant at all as to whether Johnson had established a domicile in South Carolina or had been operating the vehicle in South Carolina for an accumulated period of greater than 150 days." *Id.*

The government argued that once the trooper had reasonable suspicion to believe the windows' tint exceeded the South Carolina statutory limit, "he did not need reasonable suspicion

regarding the registration element to justify the traffic stop." *Id.* The Fourth Circuit rejected that argument, explaining that "the Fourth Amendment requires an officer to have reasonable suspicion, based on specific and articulable facts, of <u>unlawful conduct</u> in order to justify a traffic stop." *Id.* (emphasis in original). And "[w]ithout reasonable suspicion to believe that Johnson's car was required to be registered in South Carolina, [the trooper] had no reasonable suspicion of unlawful conduct, because it is not unlawful under [South Carolina's statute] for a vehicle traveling on a public highway to have a noncompliant sunscreen device unless the vehicle is also required to be registered in South Carolina." *Id.* The Court therefore reversed the denial of Johnson's suppression motion. *Id.*

*Frank Johnson*'s application to this case is straightforward. Under Maryland's window-tint statute, "a person may not operate a <u>vehicle registered under</u> § 13-912, § 13-913, § 13-917, or § 13-937 of this article on a highway in this State" unless the windows "allow a light transmittance ... of at least 35%." Md. Code Ann., Transp. § 22-406(i)(1) (emphasis added). The four subsections referenced in this statute govern four classes of vehicles that are "registered with the Administration." *See id.* §§ 13-913(a) (passenger cars and station wagons), 13-916(a) (trucks under a specified weight and capacity), 13-917 (light trucks), 13-937(a) (multipurpose vehicles). And "the Administration," as used in the Maryland Transportation Article, means the Maryland Motor Vehicle Administration. *See id.* § 11-102. Maryland's window-tint statute applies only to cars that are registered in Maryland. If a car is not registered in Maryland, it need not comply with the tint limits in § 22-406(i)(1). The principal difference between Maryland's window tint law and South Carolina's window tint law is that Maryland's applies only to vehicles that are <u>registered</u> in Maryland, while South Carolina's applies to vehicles that are <u>required to be registered</u> in South Carolina.

4

It follows that, just as the trooper in *Frank Johnson* needed reasonable suspicion as to each of the South Carolina tint statute's three elements, so too Cpl. Wigmore needed reasonable suspicion as to each of the Maryland tint statute's three elements. Specifically, Cpl. Wigmore could not stop Leonard's car unless she "possessed some minimal level of objective justification to believe that": (1) Leonard was "operat[ing] a vehicle ... on a highway in [Maryland]"; (2) Mr. Leonard's vehicle was "registered under § 13-912, § 13-913, § 13-917, or § 13-937 of [the Maryland Transportation] article"; and (3) the windows did "not allow a light transmittance ... of at least 35%." § 22-406(i)(1); *see Frank Johnson*, 256 F.3d at 216. Mr. Leonard concedes that the first element is met. But absent "reasonable suspicion regarding the registration element," Cpl. Wigmore had no legal basis "to justify the traffic stop." *Id.* at 217.

Here, no information available to Cpl. Wigmore at the time of the stop indicated Leonard's Hyundai was registered in Maryland. Indeed, all available evidence was to the contrary. The Hyundai bore permanent Virginia plates on the front and back of the car, with up-to-date registration decals:



*Left: photograph of car from discovery. Right: still from Cpl. Wigmore Body Worn Camera at 07:10.*

Even more clearly than the Georgia plate in *Frank Johnson* undermined any suspicion that the car was required to be registered in South Carolina, the license plates displayed here established that the Hyundai was <u>not</u> registered in Maryland. Cpl. Wigmore therefore lacked "reasonable suspicion, based on specific and articulable facts, of unlawful conduct," since "it is

not unlawful under [Maryland's statute] for a vehicle traveling on a public highway to have a noncompliant [tint] unless the vehicle is also ... registered in [Maryland]." *Id.*

### 2.   The government's interpretation of § 22-406 is wrong.

The government attempts to sidestep *Frank Johnson* with the novel argument that the Maryland tint statute applies to out-of-state vehicles. The government offers no legal authority for this construction of the statute while relying elsewhere in its response on caselaw that undermines this interpretation. *See Baez v. State*, 238 Md. App. 587, 596 (2018) ("[P]resumably, in order to avoid any conflict with the inter-state commerce provisions of the United States Constitution, the Legislature . . . limit[ed] the application of the [tint] law to vehicles registered only in Maryland.") (emphasis added).

The government's reading contorts, cherry-picks, and ignores the plain language of the tint statute. Statutes must be interpreted as a whole. *See United States v. Mitchell,* 518 F.3d 230, 234 (4th Cir. 2008) ("In assessing for plain meaning, '[w]e do not . . . [consider] statutory phrases in isolation; we read statutes as a whole.") (alterations in original). Here, the Maryland tint statute begins with the general rule, set forth in Paragraph 1, that "a person may not operate a vehicle **registered under [Maryland statutes]** on a highway in this state if" the windows are tinted more than 35% "except as provided in paragraph (4)."[2] (emphasis added). The statute then adds three paragraphs that supplement or modify this general rule:

- Paragraph (2) authorizes police officers to stop vehicles being operated in violation of paragraph (1), and to issue a citation and safety equipment repair order.

---

[2] The government misstates the scope of this statute. The government says that paragraph (1) "prohibits individuals from operating certain vehicles, which are required to be registered in Maryland." Resp. at 19. But § 22-406(i) only applies if the car is actually "registered." A requirement for registration is not enough.

- Paragraph (3) prohibits the <u>installation</u> of window tinting materials that do not comply with subsection (1).

- Paragraph (4) creates a limited exemption to subsection (1) for medical reasons, temporarily affixed tinting to protect children, and includes a provision stating that the tinting statute may not be construed to "[a]llow any tinting materials to be added to the windshield of a vehicle below the AS1 line or below 5 inches from the top of the windshield."

*See* § 22-406(i)(1).

The government seemingly concedes that Leonard could not lawfully stop Mr. Leonard under paragraph (1), but asserts that paragraphs (3) and (4) authorized the stop. This is incorrect.

At the threshold, the government's argument fails because it disregards that the tint statute only authorizes officers to stop vehicle who "observes that a vehicle is being <u>operated</u> in violation of <u>paragraph (1)</u>." §22-406(i)(2) (emphasis added). The law further limits officers' authority during such a stop to issuing a "citation charging the driver with the offense," and to "issue to the driver a safety equipment repair order." *Id.* There is no corresponding grant of authority for paragraphs (3) or (4).

Paragraph (3) does not authorize Cpl. Wigmore's stop for at least two reasons. First, it does not address the <u>operation</u> of a vehicle, but rather the <u>installation</u> of non-compliant tinting materials. Cpl. Wigmore did not observe Mr. Leonard <u>installing</u> the tinted windows; she saw Mr. Leonard operating a vehicle with tinted windows. Indeed, given the car's registration in Virginia, the only facts available would have suggested that any installation occurred in Virginia. That conduct would of course be subject to Virginia, not Maryland, law.

The government's reading makes even less sense when the tinting statute is read as a whole. Paragraph (1) provides the tinting requirements that apply only to Maryland-registered vehicles; paragraph (3) prohibits installing window tinting that "does not comply with . . .the light transmittance requirements specified in paragraph (1)," which apply only to certain

7

categories of Maryland-registered vehicles. In other words, by referencing paragraph (1)'s requirements, the "installation" prohibition in paragraph (3) necessarily adopts paragraph (1)'s scope. Reading paragraph (3) out-of-context as suggested by the government would lead to absurd results. For instance, there are many classes of vehicles that are not bound by the tint statute or exempted for medical reasons. If paragraph (3) were a stand-alone prohibition, it would criminalize the application of legal tint to those classes of vehicle.

The government also asks the Court to construe paragraph (4)(iv)(1)'s reference to "add[ing]" tint to the front windshield as a standalone carveout that somehow applies outside the scope of paragraph (1). Not so. Instead, paragraph (4) is an exception to paragraph (1) that allows darker tinting for people who require greater protection from the sun for medical reasons.[3] This subparagraph's reference to windshield tint is simply meant to establish that—in Maryland—while medical reasons may justify otherwise proscribed window tinting, they cannot justify window tinting below the AS1 line or below 5 inches from the top of the windshield.

Even if paragraph (4) <u>did</u> function as a general carve out to paragraph (1)'s registration requirements, it still would not justify the stop. Paragraph (4) applies to "<u>add[ing]</u> tinting materials to the windshield of a vehicle," *not* the "<u>operation</u>" of a vehicle with a tinted windshield. (Emphasis added). As is true for the "installation" of tint, *see* paragraph (3), there would be no reasonable basis for Cpl. Wigmore to suspect that Mr. Leonard had "added" tinting materials to his windshield in Maryland.

The government also implies that other states' window tinting laws reinforced the basis for the stop, repeating at least four times that front windshield tint is illegal in D.C. and all 50

---

[3] The statute does not set any minimum light transmittal requirements for people with medical exemptions.

states. Resp. at 17, 20, 24, 27. This argument is a red herring. The question in this case is whether the officers could seize Mr. Leonard for violating Maryland's traffic laws. These other laws are therefore irrelevant.

The government also suggests that the Federal Motor Vehicle Safety Standards ("FMVSS") governs window tinting of front windshields, and prohibits window glazing below a specific point of light transmission. Resp. at 20 n.5. But again, the authority the government cites does not match its argument. The FMVSS regulations apply to <u>manufacturers</u> and <u>sellers</u> of new cars in the United States, not consumers. *See* 49 U.S.C. § 30112(a). "The Federal regulation 'applies only to the windows installed by the manufacturer, not to post-manufacture tinting." *State v. Williams*, 934 A.2d 38 (Md. 2007); *see* 49 U.S.C. § 30112(b). "The post-manufacture tinting of motor vehicle windows, which is normally done through a plastic film or metallic laminate applied to the interior side of the window, is regulated largely at the State level, and the standards vary from State to State." *Williams*, 934 A.2d at 42. Accordingly, the government's reference to the FMVSS is inapposite.

### 3. Cpl. Wigmore had no facts to support a reasonable suspicion that the Hyundai was required to be registered in Maryland.

The Response introduces two additional, *post-hoc* justifications for the stop: first, that Mr. Leonard was driving through a "high-crime area," and second, that the officers were "aware that motorists in central and southern Maryland attempt to circumvent Maryland insurance laws by registering their vehicles in the Commonwealth of Virginia." Resp. at 25–26. Aside from hinting at the officers' true motivation behind the stop (to investigate Mr. Leonard and search his car), the government does not articulate how these generalized factors, in addition to tinted windows, could possibly add up to a reasonable suspicion that Mr. Leonard was violating the Maryland Transportation Code. Nor could they.

9

First, the government's troubling invocation of "high-crime area" adds nothing to the analysis. Whether or not the intersection of Silver Hill Road and Suitland Plaza Road qualifies as a "high-crime" area could not and did not create an iota of particularized suspicion that Mr. Leonard was violating the Maryland Transportation Code. "High-crime rates" do not grant police officers blanket authorization to assume that every driver passing through on a state highway has a generally lawless disposition.

Cpl. Wigmore stopped Mr. Leonard on a weekday afternoon on a clear late-summer day,[4] less than 10 miles from the Virginia border and just over 2 miles from the Washington, D.C. border on a Maryland state highway.[5] Exhibits 1 & 2. Mr. Leonard was operating a vehicle with clearly displayed permanent Virginia tags. There is no allegation that he was speeding or that he committed any other traffic infractions.

The government's invocation of "high-crime area" to justify this daytime stop is a problematic non-sequitur. The Fourth Circuit has recognized that it is often "racial minorities and individuals disadvantaged by their social and economic circumstances" who live or operate their cars in "high crime neighborhoods." *United States v. Black*, 707 F. 3d 531, 542 (4th Cir. 2013). Therefore, "[t]o conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept *carte blanche* the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people." *Id.*; *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc)

---

[4] September 12 was a hot, sunny day: around noon, the temperature was 84 °F with "fair" conditions, not overcast or rainy. *Arlington, VA Weather History: September 12, 2023*, WEATHER UNDERGROUND, https://tinyurl.com/2pee5e38 date/2023-9-12 (last visited Jun. 13, 2024). *see also* Resp. Exhibit 1 at 12:35:43.

[5] Silver Hill Road, or Maryland Route 458, is a 3.12 mile highway that connects several suburbs in western Prince George's County. *See* https://tinyurl.com/yrc3sx3e.

("The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity. . . ."). That the stop happened to occur in what officers have labelled a "high-crime area" does nothing to augment their suspicion of a violation of the Maryland transportation code.

Nor does the government's new claim that the officers knew motorists in southern Maryland often illegally register their cars in Virginia to avoid insurance requirements enhance the "totality of the circumstances." This purported basis for the stop makes no sense. First, it is only illegal for <u>permanent Maryland residents</u> to register a car in Virginia to avoid insurance requirements. Neither tinted windows nor high-crime areas increase the likelihood that a motorist driving on a state highway with Virginia tags is a permanent Maryland resident, let alone one skirting the insurance laws.  It is not at all unusual for cars from Virginia or D.C. to travel Maryland roads, and vice versa. Virginia, Maryland, and D.C. are so tightly interconnected that they are referred to by residents as the "DMV." Mr. Leonard was stopped just 10 miles from the Virginia border, and 2.1 miles from the D.C. border. It is a slippery slope from this justification to the illogical result that troopers could stop <u>any</u> car driving in Maryland with Virginia tags in a "high crime area" just to check their registration status.

But reasonable suspicion does not work that way. Police either have reasonable suspicion or they don't. And if they don't, a stop is unreasonable under the Fourth Amendment. *United States v. Feliciana*, 974 F.3d 519, 523–24 (4th Cir. 2020) (where officer pulled over car for violating regulation prohibiting "commercial vehicles" except "when authorized by a permit," reasonable suspicion was lacking because officer "offered no reason to believe [driver] was operating his truck without a permit" and "[t]he mere existence of the permit requirement does

11

not, by itself, amount to reasonable suspicion that a particular driver failed to satisfy that requirement").

### 4. *Frank Johnson* and *Brooks* are directly on point.

The government's attempt to distinguish this case from *Frank Johnson* and *United States v. Brooks*, 679 F. Supp. 3d 225 (D. Md. 2023) while analogizing to *Baez, United States v. Brandon,* ELH-22-0239, 2023 WL 6961937 (D. Md. Oct. 19, 2023), and *United States v. Devonta Johnson*, PWG-21-cr-171, 2021 WL 5882570 (D. Md. Dec. 13, 2021) should be rejected.

First, the government's reliance on *Baez* is misplaced because it is contradicted by clear Fourth Circuit precedent. As Judge Chuang explained in *Brooks*, though "*[Frank] Johnson* and *Baez* provide conflicting and contradictory holdings on the same question," "this Court is bound by Fourth Circuit precedent" and must "appl[y] the holding of *[Frank] Johnson*, a published, on-point opinion issued by the Fourth Circuit." 679 F. Supp. 3d at 237. There is no reason that *Baez* and not *Frank Johnson* would control here. When a defendant is prosecuted "in a federal court," the Fourth Amendment "test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Ker v. California*, 374 U.S. 23, 32 (1963) (emphasis added). This Court must conduct its own analysis—applying the rationale of the Fourth Circuit's binding decision in *Frank Johnson*—of whether the stop of Mr. Leonard's car for window tint violations complied with the Fourth Amendment.

Second, Judge Chuang's thorough and well-reasoned decision in *Brooks* did not, as the government writes, "assume[], without discussing, that the Maryland window tinting statute only applied to vehicles required to be registered in Maryland." Resp. at 26. Rather, the *Brooks* Court

plainly concluded that the window tinting statute did not apply to Brooks's car for two independent reasons: (1) because the car was parked, and therefore not "operating on a highway," and (2) since the car was not registered in Maryland, and, applying binding Fourth Circuit precedent to Maryland's tint statute, "a law enforcement officer must have reasonable suspicion to believe that a vehicle is required to be registered in Maryland in order to have reasonable suspicion to stop that vehicle for a violation of the Maryland window tint law." 679 F. Supp. 3d at 236-37. On the second point, *Brooks* cannot be distinguished from this case, and its core holding addresses the precise issue here—the applicability of Maryland's tint laws to a vehicle with valid out-of-state plates.

### 5. *Brandon* and *Devonta Johnson* are distinguishable.

Mr. Leonard contends that the *Brandon* and *Devonta Johnson* courts erred by applying *Baez's* deeply flawed reading of the Fourth Amendment despite *Frank Johnson*'s controlling force. But even if they were not wrongly decided, they are distinguishable in that both decisions turned materially on the fact that the vehicles had temporary tags, in addition to other factors, that gave officers reason to suspect there might be a registration issue. In *Brandon*, the officer thought the vehicle's Pennsylvania dealer's tag seemed "out of place," because the windows of the vehicle were darkly tinted, and the officer knew that a vehicle could not be sold by a dealer if incapable of passing inspection. 2023 WL 6961937, at *4. Additionally, though "the tag was owned by a dealership, no registration record was found for the car" before it was stopped. *Id.* at *21. Judge Hollander explained that these factors were "critical" in distinguishing the case from *Frank Johnson*:

> In contrast to this case, the officer in the *Frank Johnson* case had no basis to
> suspect that the vehicle with a Georgia tag was actually registered in South
> Carolina, and therefore subject to South Carolina Law; he did not attempt to

13

verify the place of registration before stopping the vehicle. But in this case, Stewart sought to determine the place of registration, without success.

*Id.* at *21.

Similarly, in *Devonta Johnson*, Judge Grimm explained that "the display of a temporary out-of-state license on a vehicle [was] relevant to whether that vehicle in fact [was] validly licensed in the out-of-state jurisdiction." *See Devonta Johnson*, 2021 WL 5883570, at * 1 (noting that the officer asked a colleague to check the registration of the vehicle prior to approaching the vehicle).

Here, unlike in *Devonta Johnson* and *Brandon*,[6] there was nothing unclear or suspicious about Mr. Leonard's license plates. In sum, the Maryland tint statute does not apply to cars that are not registered in Maryland, like Mr. Leonard's.

**B.    The Maryland Unsafe Vehicle Statute does not establish reasonable suspicion.**

The government's lead argument to justify the stop is that Mr. Leonard was operating a vehicle "[i]n such unsafe condition as to endanger any person" (here caused by excessive window tints) in violation of § 22-101(a)(1) of the Transportation Article of the Maryland Code. While this argument was raised as an alternative to the window tint argument in *Brooks*, *Devonta Johnson*,[7] and *Baez*, as the government acknowledges, no state or federal court has ever held that window tint violates § 22-101(a)(1). Resp. at 16. This is because § 22-101(a)(1) is wholly inapplicable to a car with tinted windows for two reasons.

First, the statute prohibits driving a car in such a condition that <u>the car</u> endangers other people; it does not prohibit driving the car in such a condition that <u>the occupants</u> endanger the

---

[6] And in *Baez* the court was clear that the record did "not specify when the officer learned that appellant's vehicle was registered in Virginia." 192 A.3d at 950.

[7] The *Devonta Johnson* decision made no mention of this alternative argument.

14

police or others. The state cases cited by the government for reasonable suspicion based on § 22-101 involve cars in such a condition that <u>the car itself</u>, not the driver or passenger, posed a danger to others. *See Muse v. State*, 807 A.2d 113, 119 (Md. Ct. Spec. App. 2002) ("Appellant concedes that "a cracked windshield *could* render a vehicle unsafe to drive.") (emphasis in original); *Smith v. State*, 75 A.3d 1048, 1054 (Md. Ct. Spec. App. 2013) (explaining that driving a car without a "rear deck brake light" violates § 22-101 because the light helps to prevent traffic accidents).[8]

Tinted windows do not make cars so "unsafe" that their operation would "endanger any person." Rather, as federal and state courts have explained, the danger theoretically posed by window tint is the potential threat to police officers during traffic stops by the occupants of the vehicle because "excessively tinted windows prevent officers from perceiving dangers or problems *inside* the vehicle." *Baez*, 192 A.3d at 949 (emphasis added); *see also United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997) ("[W]e can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.").

But the fact that a police officer can't see a car's occupants, and that the occupants might pose some hypothetical threat, has nothing to do with whether the <u>car</u> endangers people; rather, it's about whether the <u>occupants</u> endanger people. This is why, in *Brooks*, Judge Chuang

---

[8] *Ray v. State*, 47 A.3d 1113 (Md. Ct. Spec. App. 2023) did not involve a stop for § 22-101, but rather for a violation of § 22-203, which requires that a vehicle's headlamps "emit white light."

concluded that the safety risk posed by tint "does not relate to the safe operation of the vehicle." *Brooks*, 679 F. Supp. at 238.[9]

Second, it's not clear that tinted windows make cars less safe to drive. The government identifies no state or federal court decision concluding that tinted windows generally make vehicles unsafe; nor has it established that consensus exists regarding window tinting and highway safety, to say nothing about the intent of Maryland's unsafe vehicle statute. The sole authority pointed to by the government is *Baez*'s citation to a 1998 D.C. Court of Appeals case, which excerpted 1994 testimony by the Metropolitan Police Department" ("MPD").

The scope of Maryland's window tint statute confirms that it is <u>not</u> aimed at regulating the safety of vehicles, and therefore has no nexus to the unsafe operation of vehicles. The provisions of the statute do not apply to many classes of vehicles, including ambulances & funeral cars (§ 13-914), school vehicles (§ 13-932), limos (§ 13-939), different types of trucks (§§ 13-916–13-920), and passenger buses (§ 13-933). Moreover, the medical exemption to the tint regulations does not set <u>any floor for the amount of tint a person may apply</u>. *See* § 22-406(a)(i)(4)(i). If excess tint rendered vehicles so unsafe as to endanger any person, it would be regulated on cars driven by people in need of medical accommodation, school buses that transport volumes of children twice a day, large trucks, tractor trailers, limos and ambulances.

Even assuming for the sake of argument that window tint could be so excessive as to "endanger any person," the tint on Mr. Leonard's car did not meet this apparently fact-specific

---

[9] The government misapprehends the *Brooks* holding, writing that "Judge Chuang declined to uphold a stop on the basis of this statute after finding that the defendant was not operating on a highway, as required by the statute." Resp. at 16. But the opinion also separately determined, in the subsequent paragraph beginning with "Moreover," that (1) the government had not established that operating a vehicle with a tinted windshield or windows "constitutes unsafe operation within the meaning of the [statute]" and (2) that the threat posed by tints "does not relate to the safe operation of the vehicle." 679 F. Supp. 3d at 238.

standard. Cpl. Wigmore recognized that any safety risk would occur at night, explaining that "There is no way <u>at night</u> that you can drive safely and see out of this." Resp., at 5. But Leonard was stopped in the middle of the day, in broad daylight. In any case, even if the tint did make Mr. Leonard's car relatively less safe, that is not the standard articulated by § 22-101(a), which requires "such an unsafe condition so as to endanger any person." This provision simply does not apply here.

### C. The *Davis* good-faith exception to the exclusionary rule does not apply in this case.

The government's invocation of the good faith exception should not avert suppression. The government's central claim is that pursuant to *Davis v. United States*, 564 U.S. 229, 232 (2011), the officers relied on *Baez* as "binding appellate precedent" and thus the exclusionary rule does not apply. This misunderstands the good faith exception and again fails to take stock of the import of *Frank Johnson*, binding Fourth Circuit precedent that conclusively establishes the officers' actions were illegal.

#### 1. *Davis* recognized a narrow exception to the exclusionary rule for "objectively reasonable reliance on binding appellate precedent."

"In general, evidence discovered as a result of a Fourth Amendment violation is subject to suppression under the exclusionary rule." *United States v. Terry*, 909 F.3d 716, 721 (4th Cir. 2018). Because its "overarching purpose ... is to deter future unlawful police conduct," however, the exclusionary rule may not apply when suppression would not promote that goal. *Id.* In *United States v. Leon*,  the Supreme Court recognized an exception to the exclusionary rule for situations in which police seize evidence "in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984).

17

The Supreme Court in *Davis* extended the good-faith exception to officers' "objectively reasonable reliance on binding appellate precedent." 564 U.S. at 232. The Court wrote, "the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue." *Id.* at 238. "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* Likewise, exclusion has substantial ability to deter in cases involving "recurring or systemic negligence on the part of law enforcement." *Id.* at 240. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* at 238.

In a concurrence, Justice Sotomayor noted that *Davis* "d[id] not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* If police could avoid suppression anytime a Fourth Amendment question is "unsettled," she wrote, "'then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior.'" *Id.* (quoting *United States v. Johnson*, 457 U.S. 537, 561 (1982)).

> **2.  *Baez* is not the kind of binding appellate precedent on which police officers could reasonably rely.**
>
> > **i.    An opinion from a state intermediate appellate court does not constitute "binding precedent" for Davis purposes.**

Cpl. Wigmore could not rely on *Baez* because it was decided by Maryland's intermediate appellate court—not a federal appellate court or Maryland's highest court. A comparison to qualified immunity, which is "analogous" to the good-faith exception, *United States v. Stephens*, 764 F.3d 327, 337 n.11 (4th Cir. 2014), proves the point, *see Groh v. Ramirez*, 540 U.S. 551, 565

n.8 (2004) (noting that qualified immunity and "the 'good faith' exception to the Fourth Amendment's general exclusionary rule" employ "the same standard of objective reasonableness").

To determine whether a particular constitutional right is "clearly established" for qualified-immunity purposes, this Court looks only to the opinions of the Supreme Court, the Fourth Circuit, and the relevant state's highest court. *See Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (en banc) ("The law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state."). Those are the "'only . . . decisions'" that can render the law "clearly established." *Wilson*, 141 F.3d at 114 (quoting *Jenkins ex rel. Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997) (en banc)). It is clear that an opinion from a state's "intermediate appellate court . . . falls short of the clarity of the law required to defeat a defense of qualified immunity." *Lee v. Dugger*, 902 F.2d 822, 824 (11th Cir. 1990) (per curiam); *see also, e.g.*, *Moore v. Davis*, ___ F. Supp. 3d ___, 2023 WL 4758440, at *12 (S.D. Ind. July 26, 2023) ("[A] single, state intermediate appellate court opinion does not constitute controlling authority setting forth the parameters of a federal right.").

The same should be true in the analogous good-faith context. If an opinion from a state intermediate appellate court cannot provide the requisite clarity for qualified-immunity purposes, then it cannot provide the requisite clarity for *Davis* good-faith purposes. *See United States v. Harding*, No. 13-CR-00764-WHO-1, 2015 WL 7734211, at *3 (N.D. Cal. Dec. 1, 2015) (holding California intermediate appellate court's opinion insufficient to demonstrate *Davis* good faith); *cf. United States v. Garcia*, 68 F. Supp. 3d 1113, 1120 (N.D. Cal. 2014) (holding California

19

*Supreme Court* opinion established *Davis* good faith, but adding, "[i]t might be a different question if [the opinion] ... had been issued by an intermediate state court of appeal"). *Baez*, therefore, is not the type of "binding appellate precedent" on which officers can rely under *Davis*.

> **ii.** ***Frank Johnson* renders reliance on *Baez* objectively unreasonable.**

Assuming for sake of argument that a state intermediate appellate court's opinion <u>can</u> qualify as "binding appellate precedent" for *Davis* purposes, *Frank Johnson* nevertheless rendered reliance on *Baez* unreasonable. Accordingly, Cpl. Wigmore exhibited a culpable disregard for Mr. Leonard's Fourth Amendment rights, and the logic of the good-faith exception therefore has no application here.

The question under *Davis* is not simply whether "binding appellate precedent" on a given question exists, but whether reliance on that precedent is "objectively reasonable." 564 U.S. 232. *See Stephens,* 764 F.3d at 336 ("if 'binding appellate precedent' allowing [certain police conduct] existed in May 2011, *and if it was objectively reasonable for a reasonably well-trained officer to rely on that precedent*, then *Davis* controls, and the exclusionary rule is inapplicable.") (emphasis added).

Here, where *Baez* directly conflicts with a published opinion from the Fourth Circuit, Cpl. Wigmore's reliance on *Baez* was not objectively reasonable. "It is the federal courts that are the final arbiters of federal constitutional rights, not the state courts." *Hopkins v. Bonvicino*, 573 F.3d 752, 769 (9th Cir. 2009); *see also, e.g., Aruanno v. Hayman*, 384 F. App'x 144, 147 (3d Cir. 2010) (noting federal courts are "the 'primary and final arbiter of federal rights'") (quoting *Kovats v. Rutgers*, 749 F.2d 1041, 1046 n.5 (3d Cir. 1984)). Given federal courts' primacy in interpreting federal law, it is not "objectively reasonable" to engage in conduct that the local

federal appeals court has unambiguously held unlawful, even if a state court has reached the opposite conclusion. *Davis*, 564 U.S. 232. When a federal court of appeals has held, in a published opinion, that the exact police conduct in question is unconstitutional, an officer who engages in that conduct has not "scrupulously adhered to governing law," *id.* at 249; "acted in strict compliance with binding precedent," *id.* at 240; or followed binding precedent "to the letter," *id.* at 239. An officer who knowingly defies a federal appellate court's precedent is not "innocent," *id.* at 240, or "blameless," *id.* at 249, and he cannot be described as "not culpable in any way," *id.* at 239–40.

For these reasons, Cpl. Wigmore displayed the kind of "culpability" that justifies application of the exclusionary rule. *Id.* at 238. The good-faith inquiry imputes to police officers knowledge of the relevant case law, and this Court must therefore assume Cpl. Wigmore stopped Mr. Leonard despite knowing *Frank Johnson* had deemed her conduct illegal. *See Leon*, 468 U.S. at 919 n.20 ("The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits."). Effecting a stop in plain violation of the Fourth Circuit's binding precedent exhibits a "deliberate" and "reckless"—or, at the very least, "grossly negligent"—disregard for Fourth Amendment rights. *Davis*, 597 U.S. at 238. As a result, "the deterrent value of exclusion" in this case "is strong" and "outweigh[s] the resulting costs." *Id.* The *Davis* good-faith exception does not apply.

Even if federal courts' interpretations of federal law enjoy no privileged status in the good-faith inquiry, a split in authority precludes reliance on state law that conflicts with federal law. Thus, Cpl. Wigmore's violation of *Frank Johnson* still manifested a "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Id.*

21

As Justice Sotomayor observed in her *Davis* concurrence, *see id.* at 250–51, the Supreme Court has held the exclusionary rule must be applied in a way that encourages law enforcement "to err on the side of constitutional behavior." *Johnson*, 457 U.S. at 561. This principle should guide application of the good-faith exception for binding appellate precedent, as numerous courts have recognized post-*Davis*. *See, e.g.*, *United States v. Graham*, 796 F.3d 332, 363 (4th Cir. 2015) ("[W]hen in doubt, the government should err on the side of constitutional behavior."), *vacated on other grounds by reh'g en banc*, 824 F.3d 421 (4th Cir. 2016); *United States v. Sparks*, 711 F.3d 58, 64 (1st Cir. 2013) (explaining courts should apply *Davis* in a way that "creates an incentive to err on the side of constitutional behavior"); *United States v. Lee*, 862 F. Supp. 2d 560, 569 (E.D. Ky. 2012) (declining to apply *Davis* good-faith exception because doing so "would give police little incentive to err on the side of constitutional behavior"); *Carpenter v. State*, 228 So. 3d 535, 541 (Fla. 2017) (applying *Davis* in a way that "remind[s police] to err on the side of caution"); *State v. Mitchell*, 323 P.3d 69, 78 (Ariz. Ct. App. 2014) (declining to apply good-faith exception because suppression would "incentivize[] law enforcement to err on the side of constitutional behavior").

In the *Davis* context, incentivizing police to "err on the side of constitutional behavior" means applying the exclusionary rule when appellate precedent is "unsettled." *Johnson*, 457 U.S. at 561; *see Mitchell*, 323 P.3d at 78 ("[Because the law] was, at the very least, unsettled, application of the exclusionary rule would provide meaningful deterrence because ... it incentivizes law enforcement to err on the side of constitutional behavior."). Courts have therefore recognized the *Davis* good-faith exception does not apply when appellate precedent is "unclear," *United States v. Lara*, 815 F.3d 605, 613 (9th Cir. 2016); "not well-established," *Carpenter*, 228 So.3d at 539; or "unsettled," *United States v. Martin*, 712 F.3d 1080, 1082 (7th

22

Cir. 2013); *Garcia*, 68 F. Supp. 3d at 1119 & n.4; *United States v. Robinson*, 903 F. Supp. 2d

766, 784 (E.D. Mo. 2012); *United States v. Mayo*, No. 2:13-CR-48, 2013 WL 5945802, at *15

(D. Vt. Nov. 6, 2013); *State v. Lindquist*, 869 N.W.2d 863, 876-77 (Minn. 2015).

Instead, to encourage police to "err on the side of constitutional behavior," courts should

apply the exclusionary rule unless binding appellate precedent is "clear and well-settled," *United

States v. Bain*, 874 F.3d 1, 20 (1st Cir. 2017); "undisputed," *Brooks*, 679 F. Supp. 3d at 239; and

"unequivocal," *United States v. Buford*, 632 F.3d 264, 271 (6th Cir. 2011); *United States v.

Smith*, 741 F.3d 1211, 1221 (11th Cir. 2013); *United States v. Taylor*, 979 F. Supp. 2d 865, 875

(S.D. Ind. 2013); *see also Carpenter*, 228 So.3d at 540 (declining to apply *Davis* good-faith

exception where appellate precedent was not "well-settled, unequivocal, or clearly established").

Without addressing its outer reaches, the Fourth Circuit has applied the *Davis* good-faith

exception only when binding appellate precedent is "established and uniform." *United States v.

Kolsuz*, 890 F.3d 133, 148 (4th Cir. 2018); *accord United States v. Aigbekaen*, 943 F.3d 713, 725

(4th Cir. 2019) (same).

If *Baez*—a state intermediate appellate court opinion—is relevant at all in the face of this

Court's binding *Frank Johnson* opinion, it merely establishes that the lawfulness of Cpl.

Wigmore's stop was "unsettled" or "unclear." At most, *Baez*'s conflict with *Frank Johnson*

prevents the conclusion that the illegality of Cpl. Wigmore's conduct was "undisputed,"

"unequivocal," or "clear and well-settled." The result is that *Baez* does not provide a proper basis

for invoking the *Davis* good-faith exception. *See. Lara*, 815 F.3d at 607-09  (good faith did not

apply where conflict existed between California intermediate appellate court opinion and Ninth

Circuit precedent); *Brooks*, 679 F. Supp. 3d at 239 ("The Court is unaware of a circumstance in

which the *Davis* good faith exception was applied when the binding appellate precedent was not
uniform and instead was conflicting and contradictory.").

## II.      The frisk of Mr. Leonard was illegal.

The government does not argue that Cpl. Wigmore's frisk of Mr. Leonard was justified
by reasonable suspicion that he was armed or dangerous. Nor could they. The encounter took
place in broad daylight and up to that point had been "entirely amicable and cooperative" with no
"threatening or evasive conduct." *See United States v. Powell*, 666 F.3d 180, 187 (4th Cir. 2011).

Instead, the government argues that the frisk was consensual. Evidence presented at the
motions hearing will show that no voluntary consent was given. The circumstances surrounding
the encounter—multiple officers in multiple cars, ordering Mr. Leonard out of the car, the pace
of the questioning—were coercive, rendering any consent involuntary. *See United States v.
Justin Johnson*, No. CR TDC-16-0135, 2017 WL 2256599, at *6 (D. Md. May 22, 2017) ("'Do
you mind if I check?" did not clearly convey that checking for weapons would consist of a
search of Johnson's person, and the surrounding circumstances . . . were sufficiently coercive that
Johnson's acquiescence was not voluntary.")

The officer's actions in ordering Mr. Leonard out of the car and frisking him for weapons
were not "reasonably related in scope to the bases for the seizure." *United States v. Palmer*, 820
F.3d 640, 649 (4th Cir. 2016). While "[a]n officer is entitled to conduct safety-related checks that
do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle
registration, or checking for criminal records and outstanding arrest warrants[,]" generally, "an
officer's focus must remain on the bases for the traffic stop, in that the stop must be 'sufficiently
limited in scope and duration to satisfy the conditions of an investigative seizure.'" *Id.*

The basis for the stop was window tint. The suspected violation did not entail additional safety concerns. Once the vehicle was stopped, the "danger" purportedly created by driving the tinted vehicle immediately dissipated. Mr. Leonard did nothing to give rise to additional reasonable suspicion that warranted extending the stop or intensifying the seizure beyond what was necessary for the officer to address the traffic infractions that served as its basis. *Cf. Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (A traffic seizure is justified only if the officer diligently pursues the purpose of the stop; and deviations or delays for unrelated investigations violate the driver's Fourth Amendment right, unless supported by independent reasonable suspicion).

## III.     The impoundment and inventory search of Mr. Leonard's car were illegal.

The police officers' illegal impoundment and inventory search of Mr. Leonard's vehicle provides additional and independent bases for suppression, even if the Court were to determine the stop was valid. Under the inventory search exception to the warrant requirement, Cpl. Wigmore's actions can be justified only if (1) the decision to impound the vehicle was reasonable; and (2) the inventory search was conducted pursuant to standard police procedures to secure the car and its contents, and not for the purpose of gathering incriminating evidence. *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986) (upholding an inventory search when the officer's decision to impound the vehicle because the driver and passengers had been drinking was reasonable, making officers' custody of the vehicle lawful, and there was no evidence of an investigatory motive for the officers' inventory of the car). The government has the burden of showing both elements. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–44 (1971) (the burden is on the government to show that an exception to the warrant requirement applies).

25

This they cannot do. *First*, the circumstances of Mr. Leonard's stop did <u>not</u> reasonably justify seizure or impoundment because the impound of his car was not lawful. *Second*, even were impoundment warranted, the police officers failed to conduct the inventory search according to routine and standard practices.

### A. There was no lawful basis to impound Mr. Leonard's car.

A decision to impound a vehicle comports with the Fourth Amendment if "the circumstances reasonably justified seizure or impoundment." *United States v. Bullette*, 854 F.3d 261, 265–66 (4th Cir. 2017). "To show the lawfulness of a vehicle inventory search, the government must first establish that the vehicle was lawfully in police custody." *United States v. Lynch*, 290 F. Supp. 2d 490, 499 (M.D. Pa. 2003), *citing United States v. Frank*, 864 F.2d 992, 1001 (3d Cir. 1988); *see also United States v. Treisman*, 71 F.4th 225, 235 (4th Cir. 2023).

Here, the government asserts that the decision to impound the Hyundai was reasonable because it followed the Prince George's County ordinance governing impoundment of vehicles without prior notice. *See* Resp. at 18. Of the enumerated bases for impounding without notice, the Government offers the following reasons as potentially applicable here:

> (a) A vehicle subject to impoundment under any provision of Federal, State, or local law may be impounded without giving prior notice to its owner under the following circumstances:
>
> (1) When the vehicle is impeding or is likely to impede the normal flow of vehicular or pedestrian traffic; or
> . . .
> (3) When the vehicle imposes an immediate danger to the public safety; or
> . . .
> (4) When the operator of the vehicle has been taken into custody and impoundment of the vehicle is reasonably necessary to provide for the safekeeping of the vehicle.

Resp. at 39 (citing Prince George's Cty., Md. Code of Ordinances § 26-166 (2023).

26

Circumstances (1) and (4) do not apply here, and the government concedes as much by devoting no more than a single footnote in support of factor (1)[10] and offering no argument in support of factor (4). *See* Resp. 40 n. 6.

This leaves circumstance (3), which allows the impound without notice of "unsafe" vehicles only where "the vehicle imposes <u>an immediate danger</u> to the public safety." Resp. at 39 (quoting Prince George's Cty., Md. Code of Ordinances (§) 26-166) (emphasis added). The Prince George's County Police Department General Order Manual ("GOM") further specifies that "vehicles with defective, deficient, or altered equipment may be impounded <u>only if the continued operation</u> of the vehicle poses a hazard to its operation or the public." GOM, Vol. II, Ch. 36 at 5 (emphasis added).

Mr. Leonard's vehicle did not present <u>any</u> danger to public safety, let alone an "immediate" danger. As discussed *supra* § I(B), Maryland regulates window tint to mitigate the potential threat that <u>occupants</u> of the car might pose to officers during a traffic stop, not because of a threat posed by the tinted vehicle. *See Brooks*, 679 F. Supp. at 238 (the safety risk posed by tint "does not relate to the safety of the vehicle"). Moreover, Cpl. Wigmore specified that her safety concerns were that there would be "no way at night that you can drive safely and see out of this." Ex. 1, 12:36:00-12:36:17. Mr. Leonard was stopped at 12:35 PM, and on September 12, 2023, the sun set at 7:20 PM, leaving ample time for Mr. Leonard to get off the roads—or to even drive directly to a repair shop. This is far afield from the type of "immediate danger" contemplated by the Prince George's County Ordinance.

---

[10] Even if the vehicle was stopped in an unsafe location, as the government asserts, Mr. Leonard presented a valid driver's license and registration to the government, was not impaired, and would have been able to drive the car away after being issued citations. *See United States v. Justin Devon Johnson*, TDC-16-0135, 2017 WL 2256599, *8 (D. Md. May 22, 2017).

Tellingly, the tint statute directs officers to issue a citation and possibly a repair order when they detect excess tint; it is silent as to impoundment. *See* § 22-406(i)(2) ("If a police officer observes that a vehicle is being operated in violation of paragraph (1) of this subsection, the officer may stop the driver of the vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order in accordance with the provisions of § 23-105 of this article." § 22-406(i)(2)). If window tint posed a threat to public safety, the legislature would have included impoundment as one of the possible remedies for an officer's observation of a tint violation. Notably, the police officers in *Muse* and *Smith*—cited by the government as examples of permissible stops under the Maryland Unsafe Vehicle statute—issued repair orders and <u>did not</u> impound the vehicles. *Muse*, 807 A.2d at 118–19 (officer intended to "issue an equipment repair order"); *Smith*, 75 A.3d at 1049 (officer initiated stop to "issue a safety equipment repair order"). Counsel is not aware of any repair order issued in connection with this stop.

The government explains that "after learning that the Defendant had not insured [the] vehicle, any doubt that Cpl. Wigmore harbored about impounding the vehicle dissipated." Resp. at 40. But why? Driving uninsured, like having tinted windows, does not pose an "immediate danger" to public safety.[11] To the contrary, Cpl. Wigmore knew, at the time of the stop, that it was legal to drive in Virginia <u>without</u> insurance. Resp. at 2. In fact, Mr. Leonard told police

---

[11] To the extent driving without insurance creates risk for other drivers, it is a <u>financial</u> risk. *See* Evelyn Pimplaskar, *Virginia Changes Law: All Drivers Must Buy Car Insurance,* Insurify, Oct. 10, 2023, https://tinyurl.com/mr24sfd5 ("SB 951, the bill that repeals the uninsured motor vehicle fee, passed the commonwealth's legislature in February 2023. Sponsored by Republican Sen. Frank Ruff, the bill passed with bipartisan support, the Virginia Mercury reported. 'You and I both pay for uninsured drivers.'"); Abbie Coleman, *Get insured or lose your license: The new law for Virginia drivers*, WSLS 10 News, Apr. 24, 2024, https://tinyurl.com/3wbhtcrw ("Manager Ben Shortt tells us insurance is crucial for people who can't afford to foot the bill on car repairs after an accident. 'They're very expensive. Cars today are very sophisticated compared to what they were back in the 80′s. You've got so many electronic devices on these things, just a basic repair now, average repair is $2,000 and beyond,' Shortt said.").

officers that he had registered the car in Virginia for precisely that reason. *See* Resp. Exhibit 2 at 12:38:04 – 12:38:22.

Because police had no lawful basis to impound Mr. Leonard's car, this warrantless seizure violated the Fourth Amendment. And without a lawful basis to impound the car, police had no lawful authority to conduct an inventory search of the car either. *Treisman*, 71 F. 4th at 234. Therefore, the evidence seized pursuant to that search must be suppressed.

**B.    Even were impound permitted, the "inventory search" was unlawful.**

Because the decision to impound the Hyundai was unreasonable, Cpl. Wigmore did not have a valid basis to conduct an inventory search. Even if she did have a basis to initiate an inventory search, the Government cannot establish that Cpl. Wigmore's initial entry into the vehicle to conduct a search was pursuant to a valid inventory search.

"The inventory search exception to the warrant requirement applies only when an inventory search is conducted pursuant to standardized departmental procedures that limit police discretion," *Justin Johnson*, 2017 WL 2256599 at *9, and is performed in good faith, *see United States v. Matthews*, 591 F.3d 230, 235 (4th Cir. 2009); *Colorado v. Bertine*, 479 U.S. 367, 374 n.6; *South Dakota v. Opperman*, 428 U.S. 354, 374–76; *Bullette*, 854 F.3d at 265 (an inventory search of an automobile is lawful only if "law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents"). The purpose of the inventory search is to secure items in lawful police custody, not to gather incriminating evidence. *Treisman*, 71 F. 4th at 234. "[A]n inventory search must not be a ruse for a general rummaging." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

In *Justin Johnson*, Judge Chuang concluded that the search was not a valid inventory search because of "indicia that the search was aimed at gathering evidence." 2017 WL 2256599,

at *10. As true in *Justin Johnson*, and as will be further demonstrated at the Motions hearing, the officers' decision to impound and inventory search Mr. Leonard's car arose not from a genuine need to impound the car and a desire to safeguard the items therein, but rather from a desire to look for incriminating evidence. Even if the officers in this case had followed the GOM's standardized procedure in impounding and searching the car—which they did not—their blatantly investigatory motive for conducting the search would render it invalid. The proceeds of that search should be suppressed.

## IV.    CONCLUSION

What happened to Mr. Leonard was neither isolated nor accidental. The defense expects testimony will show this unit of the Prince George's County Police Department implements a consistent enforcement strategy of investigatory traffic stops near the D.C. border for registration or equipment violations, then, rather than verifying the driver's credentials and issuing a citation or repair order, they conduct a records check, question the driver, and ultimately search the car.[12] In 2022, the last year for which the state of Maryland has posted data on its Race-Based Traffic Stop Data Dashboard, Prince George's County Police conducted 15,648 traffic stops. Exhibit 3 (filtered for Prince George's County). Of those stopped, 72.4% were Black. Of those stops, 7,064 were for registration and equipment violations; 78.1% of those stopped for those reasons were Black. Exhibit 4 (filtered for equipment and registration violations).

---

[12] *See* Wayne R. LaFave, The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment, 102 Mich. L. Rev. 1843, 1874 (2000). ("But these days, manifesting the war-on-drugs motivation so often underlying these stops, there are various investigative activities unrelated to the infraction justifying the stop that themselves are so common as to now be a part of the routine. These activities [. . .] are: (1) a records check via radio or computer regarding the criminal history of those stopped and any outstanding arrest warrants for those individuals; (2) interrogation of those stopped directly on the subject of drugs or about the nature and purpose of their travels; (3) seeking (and often obtaining) consent to conduct a full search of the stopped vehicle; and (4) using a drug-sniffing dog to detect the presence of any drugs in the stopped vehicle.")

The government may view these stops as innocuous. After all, they are permissible under *Whren v. United States*, 517 U.S. 806 (1996). But for too many, contact with officers during traffic stops has led to tragic results. *See, e.g.,* Deirdre Byrne, *Prince George's County cop guilty for assault that left man paralyzed, judge rules*, WUSA9 (May 5, 2022)[13]; Ashley Brown, *Alleged PG County Police Brutality Caught on Tape*, NBC Washington (Mar. 4, 2009)[14]; Ben Mathis-Lilley & Elliott Hannon, *A Black Woman Named Sandra Bland Got Pulled Over in Texas and Died in Jail Three Days Later. Why?*, SLATE (July 16, 2015);[15] Assoc. Press, *Philando Castile Had Been Stopped 52 Times By Police*, CBS Minnesota (July 9, 2016)[16]; Colin Dwyer, *Former S.C. Officer Who Killed Walter Scott Sentenced To 20 Years In Prison*, NPR (Dec. 7, 2017).[17] As Judge Reeves wrote in 2020, "Black people in this country are acutely aware of the danger traffic stops pose to Black Lives." *Jamison v. McClendon*, 476 F. Supp. 3d 386, 414 (S.D. Miss. 2020). "[A]nd Black people remain at disproportionate risk of dying in an encounter with police." *Id.* at 415.

The Fourth Amendment is often the only bulwark against unwanted and dangerous police action. And in this case, the officers violated the Fourth Amendment when they stretched the traffic laws beyond their proper scope to fit their investigative purposes. While the government puts forward argument after argument about why this Court should give these officers a pass, none persuasively address the clear precedent on the books that shows his stop was illegal.

---

[13] Traffic stop for expired vehicle tags.

[14] Traffic stop for blue tinted lights.

[15] Traffic stop for improper lane change.

[16] Traffic stop for a broken tail light.

[17] Traffic stop for a broken brake light.

Because it is both legally and justly the right result, Mr. Leonard asks that the Court grant his motion to suppress.

**Dated: June 20 2024**                         Respectfully submitted,

JAMES WYDA
Federal Public Defender

___/s/_____
PATRICIA L. RICHMAN (Bar # 803572)
ELLIE MARRANZINI
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
Phone: 301-344-0600
Fax:    301-344-0019
Email: patricia_richman@fd.org
        ellie_marranzini@fd.og

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2024, a copy of the foregoing was served via CM/ECF to parties in this matter.

_____/s/_____

PATRICIA L. RICHMAN (Bar # 803572)
Assistant Federal Public Defender